[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 04-14597

_____

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
November 10, 2005
THOMAS K. KAHN
CLERK

D. C. Docket No. 02-00711-CV-CB-M

CHIKETTA TINKER,

Plaintiff-Appellee,

versus

PERRY BEASLEY,
DAN WATSON,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Southern District of Alabama

_____

**(November 10, 2005)**

Before BIRCH, HULL and BOWMAN[*], Circuit Judges.

PER CURIAM:

_____

[*]Honorable Pasco Bowman, II, United States Circuit Judge for the Eighth Circuit, sitting
by designation.

Defendants-appellants, Perry Beasley and Dan Watson, appeal the district court's denial of their motion for summary judgment based on qualified immunity and discretionary-function immunity. The appeal requires us to address: (1) whether the coercive questioning of plaintiff-appellee, Chiketta Tinker, by Beasley and Watson, constitutes a violation of Tinker's substantive due process rights even though it did not result in a confession or other self-incrimination; and (2) whether the coercive questioning rises to a level sufficient to constitute the tort of outrage under Alabama law.[1] We REVERSE and REMAND.

## I. BACKGROUND

This action arises out of Tinker's arrest, incarceration, and questioning on suspicion of murder. At the time of her arrest, Tinker was a twenty-four-year old mother of three young children. She worked in a hospital kitchen in Greensboro, Alabama. Beasley and Watson were agents of the Alabama Bureau of Investigation ("ABI") who questioned Tinker in relation to the shooting of a bank teller in the course of a robbery. Before the bank teller died at the scene, she had identified Tinker as the shooter.

Tinker was arrested at her home the same afternoon and taken to the "old

---

[1]Tinker and Beasley also appeal the court's ruling that they may not assert state-agent immunity as to any tort-of-outrage claim that might be brought against them in this case. Because we find no tort of outrage, we do not reach this issue.

jailhouse" in Greensboro where she was kept in a holding area. R1-55 at 2. Later that evening, she was taken to the Hale County jail. Patrick Arrington, an attorney called upon by her family to represent her, came to see her at some point that evening. With Arrington present, Tinker was then interviewed by Beasley. Beasley has alleged that Arrington informed him after this first interview that he was no longer representing Tinker. Beasley told Watson that Tinker was no longer represented. Arrington asserts that he never said he no longer represented Tinker, and that, to the contrary, he had instructed the investigators specifically that Tinker should not be questioned in his absence. [2]

The next day, Tinker made an initial appearance.[3] After she returned from the courthouse, Tinker was fingerprinted by Watson. Arrington was not present at the courthouse or later at the jail. Watson asserts that Tinker began asking him questions about her case, and appeared to want to make a statement. When Tinker asked for her lawyer, Watson told her that her lawyer no longer represented her. R1-44 Exh. unnumbered 1 (Deposition of Chiketta Tinker), at 213. Tinker then

---

[2]Although there is a dispute as to whether Beasley and Watson misunderstood that Arrington would continue to represent Tinker or whether they falsely informed Tinker about it, for the purposes of this appeal, we take the facts in the light most favorable to Tinker and thus operate under the assumption that they were falsely informing her. See Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2003)

[3]Although both parties' briefs refer to this court event as an arraignment, the record makes clear that it was only an initial appearance and that she was not formally charged.

signed a waiver-of-rights form and gave a statement in which she described how she knew the victim of the shooting and admitted that she had been at the bank on the day of the shooting.

Tinker asserts that throughout this and the following several days of her incarceration, Beasley and Watson interviewed her repeatedly, telling her that her lawyer had "bailed out" on her, that they were all she had to get her out of trouble, that she would never see her children again unless she confessed, and that she had two options: the electric chair or life in prison. R1-44, Exh. unnumbered 1, at 213. She says that they referred to her "sizzling" and "frying" in the electric chair, and that they further pressured her through references to her recently deceased mother. R1-19 at 3. Tinker also asserts that at some point during one of the interviews, Beasley told her that if her father or any other family members went to a lawyer on her behalf "they would fuck it up for [her]." R1-44, Exh. unnumbered 1, at 251.

Two days after the shooting, Tinker agreed to a polygraph exam in the absence of Arrington. Sometime later that day, Arrington learned about the polygraph and the interviews and complained to Beasley and Watson about both. Tinker was finally released late on the evening of the fourth day because she had been eliminated as a suspect by the authorities' capture of the actual perpetrator of the crimes. Tinker never confessed to any crime or otherwise incriminated herself.

All claims against Beasley and Watson have been dismissed except allegations that their questioning of Tinker concerning the murder (1) violated her Fourteenth Amendment, substantive due process rights and (2) constituted the Alabama tort of outrage. Beasley and Watson filed a motion for summary judgment as to the remaining claims, contesting each claim and arguing that they are protected from any constitutional claim by qualified immunity and from the state-law claim by state-law, discretionary-function immunity. The court issued an order denying summary judgment as to both claims. Beasley and Watson appeal that order.[4]

## II. DISCUSSION

A. Qualified Immunity

A district court's denial of summary judgment based on qualified immunity is reviewed de novo, construing all facts and making all reasonable inferences in the light most favorable to the non-moving party. Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004). The qualified immunity inquiry involves three steps: (1) the alleged conduct must fall within the scope of the discretionary authority of the actor; (2) if it does, we must then determine whether that conduct

___

[4]The order here appealed incorporates reasoning from an earlier order in the same case that disposed of three motions to dismiss filed by the original five defendants, three of whom were dismissed from the case on 24 August 2004.

violates a constitutional right; (3) if so, we must inquire whether the asserted right was clearly established at the time of the alleged violation. Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002). In this case, it is undisputed that Watson and Beasley were acting within the scope of their discretionary authority when they questioned Tinker.

Once action within the scope of discretionary authority has been established, a "reviewing court's first task is to determine whether the complainant has alleged the deprivation of a cognizable constitutional right." DaCosta v. Nwachukwa, 304 F.3d 1045, 1047 (11th Cir. 2002) (per curiam). The circumstances under which coercive interrogation that does not result in a confession or other self-incrimination may constitute a violation of substantive due process rights is an issue of first impression for our circuit.

The analysis of any claim to a substantive due process right should begin with "a 'careful description' of the asserted fundamental liberty interest." Washington v. Glucksberg, 521 U.S. 702, 721, 117 S. Ct. 2258, 2268 (1997) (citing Reno v. Flores, 507 U.S. 292, 302, 113 S. Ct. 1439, 1447 (1993)). That liberty interest must be "objectively, deeply rooted in this Nation's history and tradition." Id. at 720-21, 117 S.Ct. at 2268 (citation omitted).

In the context of involuntary confession, the Supreme Court has observed

that "certain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned under the Due Process Clause of the Fourteenth Amendment." Miller v. Fenton, 474 U.S. 104, 109, 106 S. Ct. 445, 449 (1985). The Court more explicitly identified the liberty interest here at issue in Chavez v. Martinez, confirming that, under some circumstances, coercive interrogation alone may violate a suspect's right to substantive due process, even when no self-incriminating statement is used against the person interrogated. See 538 U.S. 760, 780, 123 S. Ct. 1994, 2008 (2003).[5] Such a violation will be recognized, however, only where the specific conduct alleged rises to a level of coercive interrogation that "shocks the conscience." County of Sacramento v. Lewis, 523 U.S. 833, 846, 118 S. Ct. 1708, 1717 (1998).

The Supreme Court and our circuit have offered scant guidance as to what

---

[5]In Chavez, the Supreme Court addressed the coercive interrogation of a seriously medically compromised suspect. Four justices observed:

> Our views on the proper scope of the Fifth Amendment's Self-Incrimination Clause do not mean that police torture or other abuse that results in a confession is constitutionally permissible so long as the statements are not used at trial; it simply means that the Fourteenth Amendment's Due Process Clause, rather than the Fifth Amendment's Self-Incrimination Clause, would govern the inquiry in those cases and provide relief in appropriate circumstances.

Chavez, 538 U.S. at 773, 123 S. Ct. at 2004 (Thomas, J.). Three of those justices were satisfied that the circumstances of Chavez did not rise to the level of a substantive due process violation. Id. at 774, 123 S. Ct. at 2005. Five justices remanded the case for determination of "[w]hether [the complainant] may pursue a claim of liability for a substantive due process violation." Id. at 779, 123 S. Ct. at 2008 (Souter, J.).

7

conduct shocks the conscience. The Supreme Court found a conscience-shocking violation of substantive due process where police directed an emergency room doctor to extract against a suspect's will his stomach contents, which included heroine-filled capsules. Rochin v. California, 342 U.S. 165, 172, 72 S. Ct. 205, 209 (1952). On the other hand, in Moran v. Burbine, the Court found that failure of police to inform a murder suspect of telephone calls from an attorney, who had been contacted by his sister, before continuing an interrogation, did not undermine the validity of the suspect's waiver of his Miranda rights or shock the conscience when that suspect had never asked for an attorney, was unaware that his sister had called one, and had not been formally charged. 475 U.S. 412, 415, 428, 432-33, 106 S. Ct. 1135, 1138, 1145,1147 (1986). The Court in Moran concluded: "We do not question that on facts more egregious than those presented here police deception might rise to a level of a due process violation." Id. at 432, 106 S. Ct. at 1147.

Our court found a conscience-shocking violation of substantive due process in a coach's deliberate striking of a high school student in the eye with a heavy object, with enough force to cause permanent blindness, as a disciplinary action. Neal ex rel. Neal v. Fulton County Bd. of Educ., 229 F.3d 1069, 1076 (11th Cir.

2000).[6]  In contrast, shooting at a suspect to protect against that suspect's use of deadly force "does not rise to the level of egregious conduct that would shock the conscience of a person even with the most tender sensibilities."  Carr v. Tatangelo, 338 F.3d 1259, 1273 (11th Cir. 2003).  In sum, "conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level."  Lewis, 523 U.S. at 849, 118 S. Ct. at 1718; Neal, 229 F.3d at 1074.  But, "only the most egregious official conduct will be the sort of abusive executive action that can be sufficiently arbitrary for constitutional recognition as a potentially viable substantive due process claim."  Carr, 338 F.3d at 1271 (citations and alteration omitted).

Tinker argues that, because the conduct of which she complains would be a constitutional violation in a criminal procedure context, it is also necessarily a conscious-shocking constitutional violation in the context of substantive due process.  Beasley and Watson correctly respond that the two inquiries focus on different questions.  The coerced-confession inquiry looks at the state of mind of the suspect – "whether [a suspect's] will was overborne" by the totality of the

---

[6]In so finding, we relied on the fact that the Supreme Court had already clarified that "corporal punishment in public schools implicates a constitutionally protected liberty interest." Neal, 229 F.3d at 1074 (quoting Ingraham v. Wright,  430 U.S. 651, 672, 97 S. Ct. 1401, 1413 (1977)).

circumstances surrounding the giving of a confession. Schneckloth v.

Bustamonte, 412 U.S. 218, 226, 93 S.Ct. 2041, 2047 (1973).[7] The shocks-the-

conscience inquiry, in contrast, looks at the objective unreasonableness of the

officers' conduct. Because we are making the second of the two inquiries, we

must focus on Beasley and Watson's conduct asking only whether this particular

conduct – falsely informing a suspect about the status of her legal representation in

the context of an otherwise already coercive interrogation – shocks the conscience.

Although this is arguably a close case in that it implicates Tinker's right to

counsel,[8] Beasley and Watson were trying to solve a murder and bank robbery

case in which Tinker had been named by a deceased victim as the shooter. When

---

[7]The officers admit that their interrogation of Tinker was "overzealous." We do not doubt that if Tinker had made any incriminating statement, and if she had been tried for the offense, and if the prosecutor attempted to introduce any incriminating statements obtained during that overzealous interrogation, a state court may well have determined that Tinker's statements ought to be suppressed as involuntarily obtained in contravention of the Fifth Amendment privilege against self-incrimination. However, the Self-Incrimination Clause in the Fifth Amendment is not violated until a compelled statement has been used in a criminal trial or proceeding. See United States v. Verdugo-Urquidez, 494 U.S. 259, 264, 110 S. Ct. 1056, 1060 (1990) ("The privilege against self-incrimination guaranteed by the Fifth Amendment is a fundamental trial right of criminal defendants. Although conduct by law enforcement officials prior to trial may ultimately impair that right, a constitutional violation occurs only at trial."). Tinker never made any incriminating statement.

[8]Tinker initially claimed violation of her rights to counsel under the Fifth, Sixth, and Fourteenth Amendments. She failed to pursue either the Fifth or Fourteenth Amendment basis for this claim, however, and the district court dismissed the claim on the ground that her Sixth Amendment right had not yet attached because, under Alabama law, legal proceedings had not yet been initiated.

Tinker asked for her attorney, the officers falsely told her that he had abandoned her, convinced her to sign a waiver-of-rights form, and proceeded to interrogate her multiple times over the course of three days. Although the bank teller's identification of Tinker later proved to have been made in error, the officers were justified in believing they had the right person in custody at the time of the interrogation. Accordingly, although this situation presents slightly "more egregious" circumstances than those described in Moran, we are not prepared to find the officers' conduct "sufficiently arbitrary for constitutional recognition as a potentially viable substantive due process claim." See Moran, 475 U.S. at 432, 106 S. Ct. at 1147; Carr, 338 F.3d at 1271.

This case falls more in line with those cases in which police misconduct is untoward and upsetting, and yet does not rise to a level that shocks the conscience. See Lewis, 523 U.S. at 855, 118 S. Ct. at 1721 (concluding that "[r]egardless whether [initiating a high-speed automobile chase in heavy traffic] offended the reasonableness held up by tort law or the balance struck in law enforcement's own codes of sound practice, it does not shock the conscience, and [defendants] are not called upon to answer for it under § 1983"); Luckes v. County of Hennepin, 415 F.3d 936, 940 (8th Cir. 2005) (explaining that plaintiff's "substantive due process claim fails because the totality of the circumstances indicates that his lengthy

detention – while unfortunate and understandably upsetting – does not shock the conscience"); Livsey v. Salt Lake County, 275 F.3d 952, 957-58 (10th Cir. 2001) (concluding that publication by police of erroneous statement regarding private sexual proclivities of murder victim, coupled with county's refusal to grant a name-clearing hearing, "however ill-advised, inappropriate, or ill-considered it might have been, does not shock the conscience of federal judges – at least not the conscience of these three federal judges"). Accordingly, we reverse the order of the district court and find officers Beasley and Watson are entitled to qualified immunity as to Tinker's § 1983 substantive due process claim.

B. Outrage

The propriety of summary judgment on state-agent immunity grounds is also a question of law to be reviewed de novo. Taylor v. Adams, 221 F.3d 1254, 1256-57 (11th Cir. 2000). Accordingly, we initially reexamine whether Tinker established outrage under Alabama law in the first place.

To establish outrage, Tinker must show that (1) Beasley and Watson "either intended to inflict emotional distress, or knew or should have known that emotional distress was likely to result from their conduct;" (2) the conduct in question "was extreme and outrageous;" and (3) the "conduct caused emotional distress so severe that no reasonable person could be expected to endure it."

12

Stabler v. City of Mobile, 844 So. 2d 555, 560 (Ala. 2002).  "By extreme we refer to conduct so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society."  American Road Service Co. v. Inmon, 394 So.2d 361, 365 (Ala. 1981). Thus, "outrage is a very limited cause of action that is available only in the most egregious circumstances."  Thomas v. BSE Indus. Contractors, Inc., 624 So. 2d 1041, 1044 (Ala. 1993).

The Alabama Supreme Court has not yet addressed the question of whether a tort of outrage would lie given such facts as these, but has generally acknowledged only three types of cases that constitute successful outrage claims: (1) cases involving "wrongful conduct in the context of family burials"; (2) cases in which "insurance agents employ[] heavy-handed, barbaric means . . . to coerce . . . insured[s] into settling . . . insurance claim[s], and (3) cases "involving particularly egregious sexual harassment."  See id.; see also Stabler, 844 So.2d at 560 (lists same categories).  This case falls into none of these categories.

In denying summary judgment, the district court drew on a comparison with a case in which a police officer, who made obscene phone calls to and otherwise harassed a woman by way of knowledge he gained through being a police officer, was found to have committed outrage through abuse of the public trust.  See

Woodley v. City of Jemison, 770 So. 2d 1093 (Ala. Civ. App. 1999). Concluding

that Beasley and Watson had similarly abused the public trust, specifically by

lying to Tinker about her lawyer, the court found their behavior to have risen to

the level of outrage. The court further supported this position by citing a federal

district court finding of outrage where a pretrial detainee, charged with capital

murder and later exonerated, had been temporarily held on death row for the

purposes of coercing a confession. R1-55 at 9 (citing McMillian v. Johnson, 878

F. Supp. 1473 (M.D. Ala. 1995)[9]).

We find Woodley to be distinguishable in that the officer in that case was

using information gained through his position of public trust to act outside the

bounds of that position. The officers in this case were falsely informing Tinker

about her legal representation but with a view to accomplishing something within

the bounds of their role as police officers. Neither do we find the comparison to

McMillian compelling. Unlike the suspect in McMillian, Tinker was never

formally charged with this crime. Further, she was kept at the county jail and was

only verbally threatened with the death penalty – a much more abstract form of

---

[9]We in part affirmed and in part reversed the district court's summary judgment order in McMillian v. Johnson, 88 F.3d 1154 (11th Cir. 1996), amended on other grounds by 101 F.3d 1363 (11th Cir. 1996) (per curiam), and McMillian v. Johnson, 88 F.3d 1573 (11th Cir. 1996). None of these opinions overruled the trial court's finding that the alleged treatment of the suspect was sufficient to support an outrage claim under Alabama law.

14

threat than actually being held on death row.

Tinker notes parallels between the coercive questioning for the purposes of eliciting a confession in her case and the abusively coercive treatment of insureds by insurance investigators in those cases where Alabama has consistently recognized sufficiently outrageous conduct. See, e.g., National Sec. Fire & Cas. Co. v. Bowen, 447 So.2d 133, 141 (Ala. 1984) (investigators brought false charges of arson against insured, threatened to kill his two young sons, and told him he would look good lying next to his dead brother, all in an attempt to get him to settle his claim). Though perhaps these parallels are more compelling than those to be drawn with Woodley or McMillian, neither is compelling enough to overcome the very high standard set for any recognition of this tort under Alabama law. Coercion in the context of insurance investigation is an established category with respect to this tort because of the need to prevent insurance companies from intimidating insurers into settling with a view only to the monetary gain of the insurance company. There is no other civil law effectively preventing this conduct. The same does not hold for law enforcement investigators interrogating a suspect; any confession resulting from coercive questioning would be excluded as a violation of the Fifth Amendment privilege against self-incrimination. Both because suspects are thus otherwise protected from coercive interrogation and

because police interrogation is theoretically undertaken for the public good in the first instance, there is no parallel here to the insurance company's pressured settlement.

We find the officers' conduct, though generally reprehensible, not outrageous enough to meet Alabama's standards for this tort. Having found no tort sufficiently alleged, there is no need to consider the applicability of state-agent immunity.

### III. CONCLUSION

In this appeal, agents Beasley and Watson challenge the district court's denial of their motion for summary judgment as to Tinker's claims that their coercive questioning violated her Fourteenth Amendment substantive due process rights and constituted the Alabama tort of outrage. We have reviewed both the law in our circuit as to a suspect's substantive due process rights, and Alabama law as to the tort of outrage. We conclude that the coercive questioning in this case did not rise to a level that shocks the conscience sufficiently to violate Tinker's right to substantive due process. We further conclude that the officers' behavior did not rise to the level of outrage under Alabama law. Accordingly, we **REVERSE** the district court's order denying summary judgment and **REMAND** this case for proceedings consistent with this opinion.