[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 18, 2008
THOMAS K. KAHN
CLERK

_____

No. 07-15028
Non-Argument Calendar

_____

D. C. Docket No. 05-02463-CV-JTC-1

CAITLIN CHILDS,
CHRISTOPHER FREEMAN,

Plaintiffs-Appellees,

versus

DEKALB COUNTY, GEORGIA, et al.,

Defendants,

DETECTIVE D. A. GORMAN,
individually and in his official capacity as a
detective for the Homeland Security Division of
Dekalb County,
OFFICER MARK GRAHAM MAPHET,
individually,

Defendants-Appellants.

Appeal from the United States District Court
for the Northern District of Georgia
_____

**(July 18, 2008)**

Before BIRCH, DUBINA and CARNES, Circuit Judges.

PER CURIAM:

This is David Gorman and Mark Maphet's appeal from the district court's denial of their motion for partial summary judgment on qualified immunity grounds.

**I.**

Many of the facts underlying this case are hotly contested, but at this stage in the proceedings, we view the evidence in the light most favorable to the non-moving party. See Skrtich v. Thornton, 280 F.3d 1295, 1299 (11th Cir. 2002). The facts, viewed in the light most favorable to the plaintiffs, are as follows. In December 2003, Caitlin Childs and Christopher Freeman volunteered to organize a protest at the HoneyBaked Ham store on Buford Highway in Dekalb County, Georgia. They had previously participated in yearly peaceful protests at the store, and in 2003 they planned a short demonstration during which they would pass out literature to give people information about vegetarian and vegan diets. Childs and

Freeman rode to the protest with Seth Chernyak in a car driven by Misty Brown. They parked in the CVS Pharmacy parking lot across the street from the HoneyBaked Ham store.

Approximately ten to twenty people participated in the protest, which lasted about one and a half to two hours. The protestors stood on public property, and they did not block any entrance or exit to the store. They held up signs, spoke to customers who requested information, and handed out leaflets. A number of police officers arrived on the scene, including some officers that were working off-duty for HoneyBaked Ham. The officers, including Officer Maphet who was on duty but also served as head of security for HoneyBaked Ham, ordered the protestors not to pass out flyers or to talk to customers, even if the customers spoke to them first. The protestors believed that they would be arrested if they violated these orders, so they complied and stopped passing out flyers and interacting with customers.

After the protest ended, Childs, Freeman, and Chernyak walked to the CVS parking lot to check on a demonstrator who was being cited by a uniformed police officer for jaywalking. When they got there, they noticed a man sitting in a car who appeared to be taking pictures of them. The man turned out to be undercover police officer David Gorman, but because he was dressed in civilian clothes and

3

was in an unmarked police car, the protestors were not aware he was an officer. Out of a concern for their safety, Childs and Freeman walked behind Gorman's car and Childs wrote down its license plate number on a scrap piece of paper. They then waited for the two protestors being cited for jaywalking to be free to leave, got into Brown's car with Chernyak and Brown, and left the CVS parking lot to have lunch at a nearby restaurant.

Officer Gorman was concerned that Childs had written down his license plate number because he drove his undercover vehicle home every day. As a detective in the local anti-gang unit, Gorman did not want gang members to trace the number back to his home where he lived with his wife and children. He immediately got on his radio, stated that he was investigating a vehicle, and requested that another officer come to his location. Officer Maphet was nearby with another officer when he received a call over the police radio indicating that Gorman was investigating a vehicle and needed assistance. As Maphet began to maneuver his police motorcycle, he saw the vehicle that Gorman had described, which was Brown's car, exit the CVS parking lot and proceed down the road. Maphet followed them out, and as they pulled into the restaurant parking lot, Maphet was close behind. At their depositions, Maphet and Gorman testified that Brown had not committed any traffic offenses while driving to the restaurant. The

4

sole reason the officers followed the vehicle was to retrieve the tag information that Childs and Freeman had written down.

Brown was not allowed to park her car. Instead, Officers Maphet and Gorman stopped the vehicle before Brown could turn into a parking space in the restaurant's lot. Maphet had turned on the blue emergency lights on his motorcycle, which are the lights he usually used to stop a vehicle. Had Brown tried to park in a parking space or drive away, her path would have been blocked by the position of Maphet's and Gorman's vehicles.

The two officers left their vehicles, and Officer Maphet walked up to the driver's side of Brown's car while Officer Gorman came to the passenger's side. Maphet asked Brown for her license and registration, and in response, Brown asked Maphet why they were being pulled over. Maphet told Brown and the passengers that they could either do this "the easy way" or be taken to jail. On the passenger's side of the vehicle, Gorman attempted to open the passenger door but it was locked, so he ordered Childs and Freeman to unlock the door and get out of the vehicle. Childs and Freeman complied with Gorman's order.

Officer Gorman then ordered Childs to produce identification and demanded the piece of paper upon which she had written his license plate number. Childs gave Gorman her identification but refused to give him the paper with the tag

5

number. When Gorman realized that Childs was not going to give her the tag information she had written down, he moved over to talk to Freeman. Gorman asked Freeman to produce his identification and the tag information, and in response Freeman asked Gorman for identification because Gorman had not identified himself as an officer and was not in uniform. Instead of identifying himself, Gorman again demanded that Freeman produce his identification, and Freeman told him it was in his back pocket and that he would show Gorman his identification "under protest."

Officer Gorman instructed Freeman to get his identification, and as Freeman was reaching around to his back pocket to retrieve it, Gorman grabbed his wrist and said "Don't move." As Freeman tried to pull his wrist free, Gorman and Officer Maphet grabbed him and put his hands behind his back. Gorman and Maphet shoved Freeman onto the trunk of Brown's car, pinning both arms and holding his neck down with an elbow. Maphet then reached for his handcuffs and put them on Freeman. After Freeman was handcuffed, Gorman and Maphet instructed him to sit on the curb.

By this point, several other officers had arrived on the scene. One of the officers taunted Childs by asking her if she had a "goat fetish" and, when she questioned why Freeman was being arrested, the officer jokingly asked her when

6

she "got her law degree." The officers then arrested both Freeman and Childs for disorderly conduct and transported them to jail.

As a result of these events, Childs and Freeman filed a 42 U.S.C. § 1983 action against Officers Gorman and Maphet in federal district court, alleging violations of their First and Fourth Amendment rights, as well as several state law claims. With respect to the constitutional claims, the plaintiffs alleged that Maphet violated their First Amendment right to free speech by instructing them not to speak to customers during their protest, and that both defendants violated their Fourth Amendment rights by unlawfully following them into the restaurant parking lot and arresting them. The defendants moved for summary judgment on the plaintiffs' First and Fourth Amendment claims, arguing that they were entitled to qualified immunity, and the district court denied the motion. The defendants appealed, and they contend that the district court erred by: (1) improperly relying on three declarations[1] that the defendants argue were not based on personal knowledge; (2) concluding that Officer Maphet was not entitled to qualified immunity on the plaintiffs' First Amendment claim; and (3) concluding that the defendants were not entitled to qualified immunity on the plaintiffs' Fourth

---

[1] These sworn statements are labeled as declarations, and they were referred to as declarations by the parties and the district court. However, we note that these statements actually are affidavits.

7

Amendment claims.[2]

## II.

The defendants first contend that in deciding their motion for summary judgment, the district court improperly relied upon the declarations of three of the protestors—Chernyak, Brown, and Elsa Spencer—because, according to the defendants, the declarations were not based on personal knowledge as required by Federal Rule of Civil Procedure 56(e). The defendants note that, although the declarations state that during the protest Officer Maphet ordered the declarants not to speak to the customers, there is no explanation about how the declarants identified the officer as Maphet. Because the declarations lacked this factual basis, the defendants argue that it was improper for the district court to rely upon them for the proposition that Maphet was present at the protest and instructed the protestors not to speak to customers.

"A district court's denial of summary judgment based on qualified immunity is reviewed de novo, construing all facts and making all reasonable inferences in the light most favorable to the non-moving party." Tinker v. Beasley, 429 F.3d

---

[2] The defendants also contend that the district court erred by denying their motion to strike three declarations submitted by the plaintiffs on the ground that the plaintiffs failed to disclose them during discovery. However, that evidentiary ruling by the district court is outside the scope of this interlocutory appeal, which focuses on whether, viewing the facts in the light most favorable to the plaintiffs, "those facts show a violation of clearly established rights of which a reasonable official in defendant's circumstances would have known." McDaniel v. Woodard, 886 F.2d 311, 313 (11th Cir. 1989).

1324, 1326 (11th Cir. 2005). "Generally, when there are [disputed] issues of fact . . . qualified immunity must be denied because the court, at this stage of the proceedings, must view the facts most favorable to the plaintiff." Travers v. Jones, 323 F.3d 1294, 1296 (11th Cir. 2003). However, Fed. R. Civ. P. 56(e)'s "personal knowledge requirement prevents statements in affidavits that are based, in part, 'upon information and belief'—instead of only knowledge—from raising genuine issues of fact sufficient to defeat summary judgment." Pace v. Capobianco, 283 F.3d 1275, 1278 (11th Cir. 2002). Accordingly, "an affidavit stating only that the affiant 'believes' a certain fact exists is insufficient to defeat summary judgment by creating a genuine issue of fact about the existence of that certain fact." Id. at 1278–79. In Pace, this Court concluded that the district court erred by deciding that a statement in a witness' affidavit raised a genuine issue of material fact about whether the plaintiff's hands were raised where the affiant stated that he "observed motion in the red car which I believe was [the plaintiff] raising his hands toward the roof of his car in an attempt to surrender." Id. at 1279 (emphasis added).

The declarations of Brown and Chernyak each state:

At least two law enforcement officers were present at all times during the [HoneyBaked Ham] protest. The officers, including Officer Maphet, first ordered me not to pass out flyers to customers and passers by. They then instructed me not to speak with any customers, even if they spoke to us first. I understood that if I failed to obey these orders, I would be subject to arrest.

9

Spencer stated in her declaration that an officer, "which may have been Officer Maphet," instructed her not to speak to any of the customers. Each declaration contained introductory language stating that the information provided was based on the declarant's personal knowledge.

Like the affidavit in Pace, where the witness stated that he believed a certain fact, the statement in Spencer's declaration that the officer who instructed her not to speak to customers may have been Maphet is not sufficient to meet Rule 56(e)'s personal knowledge requirement with respect to Maphet's identity. See id. at 1278–79. However, the defendants do not deny that Brown and Chernyak were present at the HoneyBaken Ham protest. In addition, the statements in the Brown and Chernyak declarations clearly identified Maphet as one of the officers that instructed them not to speak to the customers, and their declarations did not contain the type of "believe" language that we concluded was insufficient to meet Rule 56(e)'s personal knowledge requirement in Pace. Id. Accordingly, the district court did not err by relying on the Brown and Chernyak declarations to establish, viewed in the light most favorable to the plaintiffs, the fact that Maphet was present at the protest and instructed the protestors not to speak to the customers.

## III.

The defendants next contend that the district court erred by concluding that Officer Maphet was not entitled to qualified immunity on the plaintiffs' First Amendment claim.[3] The defendants argue that, even if the Brown, Chernyak, and Spencer declarations are considered, they do not show that the specific plaintiffs in this case—Childs and Freeman—were instructed by Maphet not to talk to the customers. According to the defendants, proving that Maphet may have restrained the speech of third parties is not enough to make out a First Amendment claim. In addition, the defendants argue that Maphet did not limit the content of the plaintiffs' speech, but merely imposed a reasonable time and place restriction that did not violate the First Amendment. Finally, the defendants argue that, even if Maphet did violate the plaintiffs' First Amendment rights, he is entitled to qualified immunity because the right was not clearly established at the time of the violation.[4]

---

[3] The plaintiffs' First Amendment claim is directed toward Officer Maphet and does not contain any allegations against Officer Gorman.

[4] For the first time on appeal, the defendants also contend that the plaintiffs have not shown that they were on public property when Officer Maphet instructed them not to speak to the customers. However, the defendants have waived this argument because they admitted before the district court that the protestors were on the sidewalk, and in their brief to this Court, they refer to sidewalks as "public property." In addition, as we have repeatedly held, "an issue not raised in the district court and raised for the first time in an appeal will not be considered by this court." Access Now, Inc. v. Sw. Airlines Co., 385 F.3d 1324, 1331 (11th Cir. 2004) (quotation marks and citations omitted).

11

"Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Kingsland v. City of Miami, 382 F.3d 1220, 1231 (11th Cir. 2004) (quotation marks and citations omitted). "An official asserting the affirmative defense of qualified immunity must initially establish that he was acting within his discretionary authority. If the official is acting within the scope of his discretionary authority . . . the burden shifts to the plaintiff to show that the official is not entitled to qualified immunity." Skop v. City of Atlanta, 485 F.3d 1130, 1136–37 (11th Cir. 2007). This involves a two step process. First, the plaintiff must establish that the defendant's conduct violated a statutory or constitutional right. See Saucier v. Katz, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156 (2001). Next, the plaintiff must show that the right was "clearly established." Id. It is undisputed that the defendants were acting within the scope of their discretionary authority. What the parties disagree about is whether the defendants violated the plaintiffs' clearly established First Amendment rights.

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. Amend. I. As the Supreme Court has stated, "[t]here is no doubt that as a general matter peaceful picketing and

12

leafletting are expressive activities involving 'speech' protected by the First Amendment." United States v. Grace, 461 U.S. 171, 176, 103 S. Ct. 1702, 1706 (1983).

> It is also true that "public places" historically associated with the free exercise of expressive activities, such as streets, sidewalks, and parks, are considered, without more, to be "public forums." In such places, the government's ability to permissibly restrict expressive conduct is very limited: the government may enforce reasonable time, place, and manner regulations as long as the restrictions "are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." Additional restrictions such as an absolute prohibition on a particular type of expression will be upheld only if narrowly drawn to accomplish a compelling governmental interest.

Id. (internal citations omitted).

"It has long been established that these First Amendment freedoms are protected by the Fourteenth Amendment from invasion by the States." Edwards v. South Carolina, 372 U.S. 229, 235, 83 S. Ct. 680, 683 (1963). As the Supreme Court stated sixty-five years ago in Jamison v. Texas, 318 U.S. 413, 63 S. Ct. 669 (1943):

> Of course, states may provide the control of travel on their streets in order to insure the safety and convenience of the traveling public. They may punish conduct on the streets which is in violation of a valid law. But one who is rightfully on a street which the state has left open to the public carries with him there as elsewhere the constitutional right to express his views in an orderly fashion. This right extends to the communication of ideas by handbills and literature as well as by the spoken word.

13

Id. at 416, 63 S. Ct. at 671–72.

Childs and Freeman's "peaceful picketing and leafletting" on the public sidewalk near the HoneyBaked Ham store was constitutionally protected speech. See Grace, 461 U.S. at 176, 103 S. Ct. at 1706. The Brown and Chernyak declarations, considered together with the deposition testimony of Childs and Freeman, establish that Officer Maphet was present at the protest and instructed the protestors not to speak to the customers, even if the customers spoke to them first. In addition, the defendants have not presented any evidence that the protestors were violating any ordinances, such as those prohibiting trespassing or littering, which would have permitted Officer Maphet to restrict their speech. Accordingly, Officer Maphet's suppression of the protestor's speech violated Childs and Freeman's First Amendment "right to express [their] views in an orderly fashion." See Jamison, 318 U.S. at 416, 63 S. Ct. at 671–72.

Moreover, the defendants' argument that this right was not clearly established is without merit. Decisions such as Jamison and Grace, among many others, have put police officers on notice for decades that protestors present on public property have a First Amendment right to peacefully express their views, in the absence of narrowly tailored ordinances restricting the time, place, or manner of the speech. Thus, this is one of those cases where "a general constitutional rule

14

already identified in the decisional law [applies] with obvious clarity to the specific conduct in question." See United States v. Lanier, 520 U.S. 259, 271, 117 S. Ct. 1219, 1227 (1997). The district court correctly concluded that the defendants were not entitled to qualified immunity on the plaintiffs' First Amendment claim.

**IV.**

The defendants also contend that the district court erred by concluding that they were not entitled to qualified immunity on the plaintiffs' Fourth Amendment claims. The defendants argue that the district court erred by concluding that they seized Childs and Freeman, within the meaning of the Fourth Amendment, by following them into the restaurant parking lot, asking for their identification, and requesting that they return the piece of paper containing Officer Gorman's license plate number. In addition, the defendants argue that they did not violate the plaintiffs' Fourth Amendment rights by arresting them for disorderly conduct because they had arguable probable cause for the arrests. Finally, the defendants argue that, even if they violated the plaintiffs' Fourth Amendment rights, they are still entitled to qualified immunity on the ground that those rights were not clearly established.

The Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and

15

seizures, shall not be violated." U.S. Const. Amend. IV. "In construing the demands of the Fourth Amendment the Supreme Court has recognized three distinct types of police-citizen encounters. First, not every encounter between law enforcement officers and a citizen constitutes a seizure within the meaning of the Fourth Amendment." United States v. Thompson, 712 F.2d 1356, 1359 (11th Cir. 1983). "Some such contact, such as the mere approach and questioning of a willing person in a public place, involves no coercion and detention and hence is outside the domain of the Fourth Amendment." Id. "Second, ever since Terry v. Ohio[5] the Court has recognized a limited class of cases where the police-citizen encounter qualified as a seizure within the Fourth Amendment but may be justified by less than probable cause. Terry-type investigative stops satisfy the Fourth Amendment if the officer has an objective, reasonable suspicion of unlawful activity." Id. "Third, some police-citizen encounters, such as a full-scale arrest, must be supported by probable cause." Id.

A.

With respect to the plaintiffs' unlawful seizure claim arising out of their interaction with Officers Gorman and Maphet in the restaurant parking lot, the defendants admitted in their depositions that, at the time they approached Brown's

---

[5] Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1868 (1968).

16

car, they did not have reasonable suspicion to believe that the plaintiffs or the other occupants of Brown's car had committed or were about to commit any crime. According to Gorman, his purpose in speaking to the plaintiffs was to get back the piece of paper upon which Childs had recorded his license plate number. Thus, the main issue is whether the defendants' interactions with Childs and Freeman in the parking lot rose to the level of an investigative stop, which is a seizure under the Fourth Amendment. As the Supreme Court has explained:

> [A] person has been "seized" within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.

United States v. Mendenhall, 446 U.S. 544, 554, 100 S. Ct. 1870, 1877 (1980). In Miller v. Harget, 458 F.3d 1251 (11th Cir. 2006), this Court gave several more examples of actions by a police officer that "would appear coercive to a reasonable person," including when an officer activates his service vehicle's emergency lights. See id. at 1257.

Viewing the facts in the light most favorable to the plaintiffs, we conclude that the defendants' interactions with the plaintiffs in this case rose to the level of a

17

seizure for Fourth Amendment purposes. During the one-hour detention: (1) Officer Maphet engaged his vehicle's blue emergency lights as he pulled up behind Brown's vehicle; (2) the officers stopped Brown's vehicle in the middle of a restaurant parking lot, blocking Brown from either pulling into a parking space or leaving the lot; (3) the officers ordered the vehicle's occupants to produce identification and threatened to arrest them if they did not comply; (4) Officer Gorman ordered the plaintiffs to exit the vehicle and demanded that they return the piece of paper containing his license plate number; and (5) Officer Gorman grabbed Freeman's wrist when he tried to comply with the officers' requests for identification. There was a coercive show of authority by the officers under which "a reasonable person would have believed that he was not free to leave." See Mendenhall, 446 U.S. at 554, 100 S. Ct. at 1877; see also Miller, 458 F.3d at 1257. Accordingly, the defendants' detention of the plaintiffs was a seizure within the meaning of the Fourth Amendment. See Mendenhall, 446 U.S. at 554, 100 S. Ct. at 1877.

Because the defendants admittedly did not have reasonable suspicion that the plaintiffs or the other occupants of the car had engaged in any criminal activity, the seizure violated the plaintiffs' Fourth Amendment rights. See Thompson, 712 F.2d at 1359. It has been clearly established since the Supreme Court decided

18

Terry that an investigative stop—a seizure for Fourth Amendment purposes—performed without reasonable suspicion violates the Fourth Amendment. See, e.g., Mendenhall, 446 U.S. at 554, 100 S. Ct. at 1877; Miller, 458 F.3d at 1257; Thompson, 712 F.2d at 1359. That general constitutional rule applies "with obvious clarity" to the defendants' conduct here. See Lanier, 520 U.S. at 271, 117 S. Ct. at 1227. Accordingly, the district court correctly denied the defendants' motion for summary judgment on qualified immunity grounds on the plaintiffs' unlawful seizure claim.

B.

Regarding the plaintiffs' false arrest claim, the defendants contend that they had probable cause—or at least arguable probable cause—to arrest the plaintiffs for disorderly conduct. In addition, the defendants argue that Freeman struggled with Officer Gorman, and both plaintiffs refused to obey the officers' orders to calm down and to stop disturbing the peace.

"Plainly, an arrest without probable cause violates the right to be free from an unreasonable search under the Fourth Amendment." Durruthy v. Pastor, 351 F.3d 1080, 1087 (11th Cir. 2003) (citation omitted). However, "[i]f an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment,

19

arrest the offender." Atwater v. City of Lago Vista, 532 U.S. 318, 354, 121 S. Ct. 1536, 1557 (2001).

> In order for probable cause to exist, "an arrest [must] be objectively reasonable under the totality of the circumstances." This standard is met when "the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense."

Rankin v. Evans, 133 F.3d 1425, 1435 (11th Cir. 1998) (citations omitted, alteration in original).

However, even if an officer lacked probable cause for the arrest, he will still be entitled to qualified immunity if he had "arguable probable cause." Id. "Arguable probable cause exists where reasonable officers in the same circumstances and possessing the same knowledge as the Defendant could have believed that probable cause existed to arrest." Lee v. Ferraro, 284 F.3d 1188, 1195 (11th Cir. 2002) (alteration in original, quotation marks omitted). In deciding whether arguable probable cause exists, courts look at whether the officer's actions were "objectively reasonable . . . regardless of the officer's underlying intent or motivation." Id. (alteration in original, citation omitted).

In Williamson v. Mills, 65 F.3d 155 (11th Cir. 1995), this Court determined that the defendant police officer, Officer Mills, was not entitled to qualified

immunity on the plaintiff's false arrest claim where the officer arrested the plaintiff for refusing to turn over film containing pictures the plaintiff had publicly taken of several undercover officers. Id. at 157. In Williamson, the plaintiff, a veteran, decided to take pictures at a public festival for other veterans who were not able to attend. Id. at 156. Mills noticed that the plaintiff was taking pictures of some of the undercover officers, which concerned him because one of the officers had an outstanding death threat against her in connection with her undercover investigation of biker gangs. Id. Mills was concerned that the pictures could be sold to an organized crime group, which could endanger the undercover officers' lives. Id.

As the plaintiff and other veterans went to the parking lot to get their parade banner, Officer Mills stopped the plaintiff, flashed his badge, and demanded that the plaintiff turn over the film from his camera. Id. When the plaintiff refused, Mills repeated his demand several times, and when the plaintiff tried to leave, Mills grabbed him, pushed him against a van, and handcuffed him. Id. Mills then took the plaintiff to his police van, where he continued to demand the plaintiff's film. Id. At one point, Mills tried to take the camera by force, and the plaintiff protested. Id. at 156–57. Finally, another officer got the plaintiff to turn over the film by informing him that the camera would be taken away when he was taken to

21

jail anyway. Id. at 157. The plaintiff then retrieved the film from the camera and gave it to Mills, who gave the plaintiff five dollars to reimburse him for the cost of the film. Id.

The plaintiff sued Officer Mills, alleging a claim for false arrest, and this Court concluded that Mills was not entitled to qualified immunity on that claim. Id. According to this Court, "[a]n officer in Mills's shoes could not have reasonably concluded that he had probable cause to arrest [the plaintiff]." Id. at 158. Mills did have reason to believe that criminal activity may have been underway because of the death threat against the officer and the potential for the photographs to be sold to organized crime groups. Id. However, "[w]hat was fatally missing from Mills's knowledge . . . was a link between the suspected criminal activity and [the plaintiff]." Id. "The mere fact that [the plaintiff's] photographs could have been used for unlawful activity . . . is not enough to establish even arguable probable cause for [the plaintiff's] arrest unless Mills had some datum to connect [the plaintiff] to the death threats or other crime." Id.

The facts in this case, where the defendants admittedly detained the plaintiffs for writing down Officer Gorman's license plate number in a public parking lot, are materially indistinguishable from Williamson. In this case, as in Williamson, the plaintiffs legally obtained information about police officers in a public place,

22

and the defendant officers sought to obtain the information. See id. at 156. In this case, as in Williamson, when the plaintiffs refused to turn over the information, the defendant officers insisted that they turn it over and arrested the plaintiffs after they repeatedly refused to do so. See id. at 156–57. In this case, as in Williamson, the defendant officers were concerned that criminal activity was underway because Officer Gorman and his family could have been endangered if gang members he had been investigating undercover got access to the license plate number and realized that Gorman was an officer. See id. at 158. And in this case, as in Williamson, what the officer lacked "was a link between the suspected criminal activity and" the plaintiffs. Id. It follows that in this case, as in Williamson, the defendants lacked arguable probable cause to arrest the plaintiffs. See id.

The fact that Childs and Freeman may have verbally protested the officers' actions during the detention does not change this result. In Williamson, this Court stated that during his interaction with Officer Mills, the plaintiff refused to turn over the film, tried to leave, and "protested" when Mills tried to take the camera by force. See id. at 156–57. However, this Court still concluded that Mills lacked even arguable probable cause to arrest the plaintiff. Id. at 158. The same is true here. The Williamson case put the officers on notice that their conduct violated the Fourth Amendment. See id. Therefore, the district court correctly concluded that

23

the defendants were not entitled to qualified immunity on the plaintiffs' false arrest claim.

**AFFIRMED.**