[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
September 4, 2008
THOMAS K. KAHN
CLERK

No. 08-11161
Non-Argument Calendar

D. C. Docket No. 06-00528-CV-4-WS

SARAH SMITH,

Plaintiff-Appellant,

versus

LARRY CAMPBELL,
in his official capacity as the sheriff of Leon
County, Florida,
DEREK TERRY,
CURTIS PARKER,

Defendants-Appellees,

MD DAVID T. STEWART, et al.,

Defendants.

Appeal from the United States District Court
for the Northern District of Florida

**(September 4, 2008)**

Before ANDERSON, HULL and KRAVITCH, Circuit Judges.

PER CURIAM:

Sarah Smith appeals two orders of the district court in her case against medical examiners and Sheriff's deputies for the handling of the investigation into the death of her boyfriend, Timothy Robinson. Smith appeals the grant of a motion to dismiss defendants David T. Stewart and Louis S. Sarbeck. Smith also appeals the grant of summary judgment for defendants Derek Terry, Curtis Parker, and Larry Campbell. For the reasons stated below, we affirm.

## BACKGROUND

On the evening of January 12, 2002, Smith and Robinson were drinking heavily at Smith's home.[1] They began fighting and Smith called 911 to request help with Robinson whom she stated had become violent. Robinson's voice could be heard in the background of the 911 tapes thereby establishing that he was alive at the time of the call. A short while later Sheriff's deputies arrived and found Robinson lying on the bedroom floor. Robinson's eyes were closed and there was a small amount of blood on his head, but he appeared to be breathing. Smith told the deputies she did not know how he had gotten to the floor. Robinson was taken

---

[1] Because Smith appeals from a motion to dismiss and a summary judgment ruling, the facts are stated in the light most favorable to Smith.

to the hospital where the medical personnel discovered a bullet in his head. This information was relayed to the deputies on the scene. The deputies asked Smith if there was a gun in the home, and she led them to a locked lock-box under her bed. Inside was a gun, loaded except for one empty chamber and a shell casing. The deputies then took Smith and her son, Vincent Smith, to the Sheriff's Office for questioning. Robinson died of the gunshot wound to his head.

The deputies arrived at the Sheriff's Office with Smith at approximately 3:00 am. Smith was repeatedly questioned about the events of the evening and Robinson's injury over a period lasting from six to eight hours. During this time, Smith was not given food nor allowed to sleep. Smith requested her anti-anxiety medication, but was told that medication is not administered at the Sheriff's Office. She was allowed a few cigarette breaks. She was interrogated by as many as six deputies, including defendants Terry and Parker. Smith told them that she did not know how Robinson had been shot and that she had not done it. Terry and Parker told her that she had shot Robinson in self-defense and it was therefore a justifiable shooting. They also told that if she would just confess, then she could check on her son and go see Robinson at the hospital. According to Smith, the presence of multiple deputies in the interrogation room was very intimidating, and at one point Parker dragged a chair up to Smith and questioned her while only

3

inches from her face. The deputies also yelled and swore at Smith whenever she said that she had not shot Robinson. Smith further alleges that she was so intoxicated, anxious, sleep-deprived and confused by the actions of the deputies that she lost her "ability to know truth from fiction." Smith then confessed to shooting Robinson even though she had not done so, and the deputies charged her with his murder.

The deputies informed defendant Sarbeck, the medical examiner, that Smith had confessed to the shooting. Sarbeck then ceased his examination of Robinson's body and recorded the cause of death as homicide. Sarbeck, therefore, did not discover at that time that there was gunshot residue on Robinson's hand nor did he note that the gunshot wound was a "contact wound" indicating that Robinson had been shot while the metal of the gun was touching his head. According to Smith, both of these facts typically indicate suicide.

A grand jury indicted Smith for Robinson's murder, but she was acquitted by a jury at trial. She then brought this action against Sheriff Larry Campbell, Sherriff's deputies Terry and Parker, Associate Medical Examiner Sarbeck, and Sarbeck's supervisor, Medical Examiner David Stewart. Her claims are as follows: false imprisonment / false arrest against Sheriff Campbell (count 1); false imprisonment / false arrest against Terry and Parker (count 2); negligence in

4

performing the investigation of Robinson's death against Sheriff Campbell (count 3); negligence in performing Robinson's autopsy against Sarbeck (count 4); negligence in supervising Sarbeck against Stewart (count 5); violation of Smith's Fourteenth Amendment substantive due process rights against Sheriff Campbell, Terry, and Parker (count 6); intentional infliction of emotional distress against Terry and Parker (count 7); negligent supervision and training of Terry and Parker against Sheriff Campbell (count 8); violation of Smith's Fourth Amendment rights due to unlawful seizure against Sheriff Campbell, Terry, and Parker (count 9); and false arrest in violation of the Fourth Amendment against Sheriff Campbell, Terry, and Parker (count 10).

The district court dismissed Smith's claims against the medical examiners Sarbeck and Stewart based on the absence of a duty owed to Smith. At the close of discovery, the district court granted summary judgment to defendants Campbell, Terry, and Parker. The court held that the interrogation of Smith did not "shock the conscience," and therefore did not violate Smith's due process rights. The court also held that probable cause supported Smith's arrest, and thus that Smith's Fourth Amendment rights were not violated. Smith timely appealed.

**STANDARD OF REVIEW**

We review the grant of a motion to dismiss <u>de novo</u>, "accepting the allegations in the complaint as true and construing them in the light most favorable to the plaintiff." <u>Spain v. Brown & Williamson Tobacco Corp.</u>, 363 F.3d 1183, 1187 (11th Cir. 2004).

"We review the district court's grant of summary judgment <u>de novo</u>, applying the same legal standards that bound the district court, and viewing all facts and reasonable inferences in the light most favorable to the nonmoving party." <u>Cruz v. Publix Super Markets, Inc.</u>, 428 F.3d 1379, 1382 (11th Cir. 2005) (citation and quotation omitted). Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

**DISCUSSION**

*I. Claims Against the Medical Examiners*

"To state a claim for negligence under Florida law, a plaintiff must allege that the defendant owed the plaintiff a duty of care, that the defendant breached that duty, and that the breach caused the plaintiff to suffer damages." <u>Lewis v. City of St. Petersburg</u>, 260 F.3d 1260, 1262 (11th Cir. 2001) (citing <u>Paterson v. Deeb</u>, 472 So.2d 1210, 1214 (Fla. Dist. Ct. App. 1985)). Although the Florida

constitution establishes sovereign immunity from tort liability, see Fla. Const., Art. X, § 13, Florida has waived this immunity "under circumstances in which the state or such agency or subdivision, if a private person, would be liable to the claimant, in accordance with the general laws of this state." Fla. Stat. § 768.28(1).

The investigation of criminal activity is a duty that law enforcement officials owe to the public as a whole, not to individuals. Miami-Dade County v. Fente, 949 So.2d 1101, 1103 (Fla. Dist. Ct. App. 2007); see also Trianon Park Condo. Ass'n v. Hialeah, 468 So.2d 912, 919 (Fla. 1985) ("[T]here has never been a common law duty to individual citizens for the enforcement of police power functions."). "The responsibility to enforce the laws for the good of the public cannot engender a duty to act with care toward any one individual, unless an official assumes a special duty with regard to that person." Pollock v. Florida Dept. of Highway Patrol, 882 So.2d 928, 935 (Fla. 2004). The performance of an autopsy is a part of the law enforcement investigation into the death of the victim. As such, there is no duty to the suspect of a perceived homicide, but rather a duty to the public to accurately perform the autopsy.

Governmental tort liability may also exist under Florida law where the government agent by his conduct creates a foreseeable zone of risk which includes the plaintiff or where the government agent assumes a special duty through his

affirmative conduct.  Id. at 935-936.  Smith has not alleged that either Sarbeck or Stewart made particular promises to her nor that she relied on such promises, and so has not alleged that the medical examiners assumed a special duty to her.  Smith does, however, argue that by undertaking the autopsy, Sarbeck created a forseeable zone of risk that included Smith.  We disagree.

Florida courts have established that when government officials undertake some risky behavior, they owe a duty to those individuals who could potentially be harmed by this behavior (those within the "foreseeable zone of risk") to take reasonable precautions just as an ordinary non-government citizen would owe.  See Kaisner v. Kolb, 543 So.2d 732, 735-36 (Fla. 1989) (finding that an officer who detains a motorist on the side of the highway owes that individual a duty to lessen the risk associated with standing in close proximity to speeding vehicles) ; City of Pinellas Park v. Brown, 604 So.2d 1222, 1225 (Fla. 1992) (holding that a duty of care is owed to innocent bystanders during a high-speed vehicle chase).  But there is no duty when the government agent completes ordinary, typical government work.  Franco v. Miami-Dade County, 947 So.2d 512, 517 (Fla. Dist. Ct. App. 2007).  Unlike the officers in Brown and Franco, the medical examiners in this case created no "zone of risk" by their behavior; they engaged in no risky behavior that jeopardized Smith's safety.  Instead, Sarbeck performed an autopsy

8

that was a normal part of his everyday government work. Thus, no zone of risk was created that would have established a duty of care to Smith.

Because Sarbeck and Stewart owed no duty of care to Smith, the motion to dismiss was properly granted in their favor.

## II. *Violations of Substantive Due Process*

Smith claims that the interrogation techniques used to obtain her confession violated her substantive due process rights under the Fourteenth Amendment. We find that the interrogation techniques used were constitutionally permissible, and affirm summary judgment in favor of the defendants on Smith's due process claim.

"[C]ertain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned under the Due Process Clause of the Fourteenth Amendment." Miller v. Fenton, 474 U.S. 104, 109 (1985). "Only the most egregious official conduct," however, will rise to the level of a constitutional violation. County of Sacramento v. Lewis, 523 U.S. 833, 846 (1998). To violate the suspect's due process rights, the interrogation techniques must "shock the conscience." Id. at 846-47. The conduct must be more than simply "untoward and upsetting." Tinker v. Beasley, 429 F.3d 1324, 1329 (11th Cir. 2005) This test

focuses on the objective reasonableness or unreasonableness of the officers' conduct rather than on the subjective state of mind of the suspect. Id. at 1328.

The deputies' interrogation techniques in this case do not rise to the level of what shocks the conscience. In Tinker, this court held that the suspect's due process rights were not violated where the officers repeatedly interrogated Tinker over several days, told her that she would never see her children again unless she confessed and that she would be going to the electric chair, and falsely informed her that her lawyer had abandoned her. Id. at 1326. This court also noted that the officers in Tinker were "justified in believing they had the right person in custody at the time of the interrogation" which added to the objective reasonableness of the officers' interrogation. Id. at 1329.

There are similarities to this case that indicate Smith's interrogation also does not "shock the conscience." Smith was similarly told that she would not be able to check on her son until she confessed, but her interrogation lasted only 6-8 hours instead of the "several days" to which Tinker was subjected. Smith's right to counsel was not implicated in her interrogation, and it was that issue that this court decided made Tinker a "close call." Id. at 1329. Additionally, just as in Tinker, the deputies here were justified in believing that Smith had shot Robinson. Smith and Robinson had been involved in a domestic dispute just prior to

10

Robinson sustaining his injuries, Smith and her son Vincent were the only ones in the house, the gun was in a lockbox under the bed which seemed inconsistent with Robinson shooting himself, and Smith maintained that she was completely unaware that Robinson had been shot at all, from which the deputies reasonably inferred that Smith was refusing to cooperate.

A few facts, however, distinguish this case from Tinker and suggest that Smith's interrogation may have been more extreme that the interrogation involved in Tinker. Here, Smith was excessively intoxicated at the outset of the interrogation, she was denied her anti-anxiety medication, was sleep-deprived, and was never given food throughout the 6-8 hours of interrogation. First, the "sleep deprivation" at issue here does not shock the conscience. Circumstances certainly exist where depriving a suspect of sleep over a period of time would represent "egregious conduct" constituting a constitutional violation. Here, however, the deputies arrived at the scene close to midnight and did not learn that Robinson had been shot until close to 3:00 am. Given those circumstances, it is not unreasonable to immediately begin interrogating the primary murder suspect without first letting her have a night's sleep. The fact that Smith was drunk also does not "shock the conscience." Although her drunken state of mind would be relevant to whether the confession could be admitted at trial, it is the objective

11

reasonableness of the deputies' conduct that is at issue here. Tinker, 429 F.3d at 1328 (noting the difference between the "shocks the conscience" test for claims of constitutional violations and the evaluation of whether the suspect's will was overborne that is applied in the criminal procedure context). Smith has identified no negative impact upon her of being interrogated while intoxicated, other than an increased likelihood of falsely testifying which is not at issue here. See Lewis, 523 U.S. at 849 (stating that "conduct deliberately intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level"). Finally, Smith was denied her anti-anxiety medication. Although the denial of medication may under certain circumstances represent conduct so egregious that it shocks the conscience, that is not true under these facts. We might find it unreasonable if the interrogators had refused a diabetic her insulin or an asthmatic experiencing an asthma attack her treatment, but we do not agree that the denial of all medication under all circumstances constitutes a deprivation of substantive due process. The deputies denied Smith her anti-anxiety which Smith states resulted in "panic attacks." She has not alleged any physical injury or truly debilitating mental injury nor adverse medical consequences flowing from the denial of her medication, and nor does the record indicate such results occurred. Under these circumstances and on this

12

record, we find that the temporary denial of one dose of Smith's medication does not constitute the kind of conduct that shocks the conscience. We, therefore, find that Smith's substantive due process rights were not violated, and affirm the district court's summary judgment ruling for defendants Terry and Parker on those claims. Having found no due process violation by Terry and Parker, we find no violation by their supervisor, Sheriff Campbell.

*III. False Arrest*

Smith also alleged that deputies Terry and Parker seized and arrested her without probable cause in violation of the Fourth Amendment. Smith argues that exculpatory evidence was available to the deputies and, therefore, they did not have probable cause to arrest her. Smith points to the inconsistencies in her confession with the position of Robinson's body as the deputies found in the home, and the existence of gun shot residue on Robinson's hand. We agree with the district court that probable cause did support Smith's arrest and affirm the district court's summary judgment ruling in favor of the defendants.

A warrantless arrest without probable cause violates the constitution and forms the basis for a section 1983 claim. Herren v. Bowyer, 950 F.2d 1543, 1547 (11th Cir. 1988). "The existence of probable cause, however, is an absolute bar to a section 1983 action for false arrest." Marx v. Gumbinner, 905 F.2d 1503, 1505-

06 (11th Cir. 1990).  "Probable cause to arrest exists when law enforcement officials have facts and circumstances within their knowledge sufficient to warrant a reasonable belief that the suspect had committed or was committing a crime." United States v. Gonzalez, 969 F.2d 999, 1002 (11th Cir. 1992).  "Probable cause does not require overwhelmingly convincing evidence, but only reasonably trustworthy information."  Ortega v. Christian, 85 F.3d 1521, 1525 (11th Cir.1996) (internal quotation and citation omitted).  Whether probable cause existed is determined by information known to the arresting officers at the time of the arrest. See Reese v. Herbert, 527 F.3d 1253, 1272 (11th Cir. 2008).

In this case, Terry and Parker had reasonably trustworthy evidence indicating that Smith had shot Robinson, and thus had probable cause to arrest her. The deputies knew that shortly before they arrived at Smith's home and found Robinson unconscious, he and Smith had been involved in a domestic dispute that was serious enough that Smith felt the need to call 911.  Most important, the deputies had found a gun with one chamber empty but the other chambers loaded together with a shell casing under Smith's bed in a locked lock-box.  The deputies were thus presented with Smith's implausible theory that Robinson had silently shot himself in the head and then, by himself, placed the gun and shell casing into a lock-box and hidden it under the bed, or the reasonable inference that Smith had

14

shot Robinson. The evidence before the deputies would thus warrant the belief by a man of reasonable caution that Smith had shot Robinson. Although some evidence may have suggested that Smith's confession did not fit the evidence at the scene, this could reasonably indicate that Smith's confession was inaccurate or untruthful without extinguishing the value of the other evidence indicating her guilt. Probable cause was not negated because Smith protested her innocence and maintained that she had not heard a gunshot. Marx, 905 F.2d at 1507 n.6 (officers may disregard a suspect's different version of events where other evidence supports probable cause of his guilt). The fact that later evidence proved that Robinson had shot himself does not diminish the reasonableness of the officer's belief that Smith had shot him based on the evidence known to them at the time they seized her and then arrested her. Id. at 1507.

We hold that probable cause existed to support Smith's arrest, and, therefore, that Terry and Parker did not violate her constitutional rights. Because we conclude that Terry and Parker did not violate her rights, we conclude that the claims against their supervisor, Sheriff Campbell, also fail.

## CONCLUSION

For the foregoing reasons, the orders of the district court are **AFFIRMED**.

15