[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MARCH 01, 2002
THOMAS K. KAHN
CLERK

----------------------------------------
No. 01-13186
----------------------------------------

D. C. Docket No. 00-00032 CV-DHB-1

PATRICIA PACE, as surviving parent, personal
representative and Administratrix of the Estate
of Alfaigo Davis, deceased,

                                        Plaintiff-Appellee,

        versus

NICHOLAS CAPOBIANCO, individually and in his
official capacity as Deputy Sheriff of Richmond
County, GARY CLARK JR., individually and in his
official capacity as Deputy Sheriff of Richmond
County,

                                        Defendants-Appellants.

----------------------------------------------------------------
Appeal from the United States District Court
for the Southern District of Georgia
----------------------------------------------------------------
**(March 1, 2002)**

Before EDMONDSON, HILL and LAY*, Circuit Judges.

_____

• Honorable Donald P. Lay, U.S. Circuit Judge for the Eighth Circuit, sitting by
designation.

EDMONDSON, Circuit Judge:

This case is about the use of deadly force, the Fourth Amendment and qualified immunity. We must determine whether two policemen are entitled to qualified immunity for their act of shooting a fleeing suspect. The case is before us to review the denial of summary judgment.

BACKGROUND

a.

We have resolved all factual disputes in the record in Plaintiff's favor when sufficient, competent evidence was present to support Plaintiff's version of the disputed facts. Viewed in that light, these circumstances are material.

On 21 February 1998, Alfaigo Davis ("Davis") was pulled over at night for driving without his headlights on by Deputy Phillip Barnett.[1] Davis had no driver's license with him and gave a false name and social security number to Deputy Barnett: when Deputy Barnett ran the social security number, it came back as

---

[1]Plaintiff does not contend that this stop was improper.

belonging to a woman. Deputy Barnett ordered Davis to get out of his car and to place his hands on the hood of the police car.

Davis, after asking if he was under arrest and receiving a negative response, placed his hands on the hood of the car. As Deputy Barnett patted him down, Davis refused to remain still.[2] A struggle ensued,[3] and Davis broke away from Deputy Barnett and began to run.

Davis, with Deputy Barnett about five steps behind him, ran around a house and returned to Davis's car. Davis started his car. But, Davis's window was open a little. Deputy Barnett, with his gun in one hand and pepper spray in the other, reached through the opening and sprayed pepper spray at Davis's face. Undaunted, Davis drove off.

Deputy Barnett returned to his car and used his radio to inform dispatch that Davis was fleeing. A signal 32 -- officer needs assistance, all units (on or off-duty) drop what you are doing and proceed to that officer's location -- was initiated at some point. (Deputy Barnett testified that the dispatcher initiated the signal 32.) Deputy Barnett began his pursuit of Davis. A high-speed chase ensued.

---

[2]At some point, Deputy Barnett called for backup.

[3]Deputy Barnett testified that Davis did not swing at him, but did throw some elbows, push off from the police car and generally not submit to the pat-down.

Many police cars responded to the signal 32 radio call. And, at least five police cars were directly involved in the pursuit of Davis. During the pursuit, Davis drove dangerously in several ways. First, Davis made a left turn in front of Deputy Leslie Boatright, forcing Deputy Boatright to stop his police car. Second, Davis swerved his car at police cars coming towards him from the opposite direction.[4] Third, Davis drove through someone's front yard at 50-60 mph and passed by their house, causing Deputy Capobianco to fear for the safety of the people he could see inside the house.[5] Fourth, Davis almost hit an elderly motorist head-on when he (Davis) was driving on the wrong side of the road: the elderly motorist avoided the collision by stopping on the shoulder of the road when he saw the approaching police lights; the motorist did not see Davis until he passed because Davis's headlights were still not on. Fifth, Davis accelerated towards a police car trying to block the road, causing the officer driving that car to move the car out of the road to avoid a collision.

---

[4]One of the police cars at which Davis swerved was driven by Deputy Nicholas Capobianco. Deputy Gary Clark witnessed Davis swerve towards the police cars and attempted to warn them over the radio.

[5]It was during this maneuver by Davis that Deputy Boatright's car became the lead chase car, Deputy Clark's car became the second car, Deputy Capobianco's car became the third car, and Deputy Shepard's car became the fourth car.

After roughly 15 minutes of high-speed, reckless flight, Davis turned into a dead-end cul-de-sac. Davis drove to the back of the cul-de-sac and stopped. Deputy Boatright then stopped his car on the left side of the cul-de-sac (to the left of Davis's car), Deputy Clark stopped his car on the right side of the cul-de-sac (to the right of Davis's car), Deputy Capobianco stopped his car behind Deputy Clark's car (behind Davis's car), and Deputy Shepard stopped his car behind Deputy Capobianco's car. The cars (Boatright's, Clark's, and Capobianco's) effectively blocked in Davis's car on three sides, leaving the area in front of Davis's car unobstructed by police cars.[6] Davis remained in his car with the engine running. Deputy Clark and Deputy Capobianco, among other deputies, jumped out of their cars and yelled at Davis to "get out of the car."

Within a moment of Davis's car stopping (at most, a very few seconds), Deputy Clark -- from a position in front of Davis's car -- fired two shots at Davis through the front windshield. At the same time, Davis's car began moving forward. Deputy Clark fired five more times as Davis's car moved forward. Deputy Capobianco also fired five times as Davis's car moved forward. The car then crossed a yard and stopped when it struck the pole of a basketball goal in a

[6]The front of Davis's car was three to four feet away from the curb when it stopped.

5

residential backyard. Davis was dead. The whole event at the cul-de-sac was a matter of seconds.

b.

In two specific instances, we conclude that insufficient competent evidence exists to support Plaintiff's version of the facts. Because the case comes to us at the summary judgment stage and because we decline to accept two of Plaintiff's contended-for facts as true and decline to include them in the facts for purposes of our review, we will explain our thinking.

Plaintiff points to evidence attempting to establish two additional facts as material. But, insufficient evidence supports the existence of the facts. See generally Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) ("For factual issues to be considered genuine, they must have a real basis in the record.") (quoting Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)). Plaintiff claims that evidence supports the fact that Davis had his hands raised when he stopped the car in the cul-de-sac. Plaintiff claims that evidence supports the fact that Davis posed no threat of serious physical harm to the officers when he was shot. The evidence pointed to for support of both of

Plaintiff's alleged additional facts is an affidavit by Willie Hedge ("Hedge"), a witness to the events that occurred in the cul-de-sac.

i.

According to that affidavit, Hedge, from the front porch of his house on the cul-de-sac, "observed motion in the red car which I believe was [Davis] raising his hands towards the roof of his car in an attempt to surrender." The district court concluded that this statement was sufficient to create an issue of fact about whether Davis's hands were in the air. We disagree.

The Rules are clear: "Supporting and opposing affidavits <u>shall</u> be made on personal knowledge." Fed. R. Civ. P. 56(e) (emphasis added). Rule 56(e)'s personal knowledge requirement prevents statements in affidavits that are based, in part, "upon information and belief" -- instead of only knowledge -- from raising genuine issues of fact sufficient to defeat summary judgment. <u>See</u> <u>Stewart v. Booker T. Washington Ins.</u>, 232 F.3d 844, 851 (11th Cir. 2000) ("upon information and belief" insufficient); <u>Fowler v. Southern Bell Tel. and Tel. Co.</u>, 343 F.2d 150, 154 (5th Cir.1965) ("knowledge, information and belief" insufficient); <u>Robbins v.</u>

7

Gould, 278 F.2d 116, 118 (5th Cir. 1960) ("knowledge and belief" insufficient).[7] Likewise, an affidavit stating only that the affiant "believes" a certain fact exists is insufficient to defeat summary judgment by creating a genuine issue of fact about the existence of that certain fact. Jameson v. Jameson, 176 F.2d 58, 60 (D.C. Cir. 1949) ("Belief, no matter how sincere, is not equivalent to knowledge."); see also Tavery v. United States, 32 F.3d 1423, 1426 n. 4 (10th Cir. 1994); Hansen v. Prentice-Hall, Inc., 788 F.2d 892, 894 (2d Cir. 1986). Even if the affidavit is otherwise based upon personal knowledge (that is, includes a blanket statement within the first few paragraphs to the effect that the affiant has "personal knowledge of the facts set forth in th[e] affidavit"), a statement that the affiant believes something is not in accordance with the Rule. See Cermetek, Inc. v. Butler Avpak, Inc., 573 F.2d 1370, 1377 (9th Cir. 1978) (equating "I understand" statement in affidavit to inadmissible "I believe" statements and concluding that statement is inadmissible despite general averment to personal knowledge at beginning of affidavit). The district court's treatment of the "believe" portion of Hedge's statement in his affidavit -- that Hedge "observed motion in the red car which I believe was [Davis] raising his hands towards the roof of his car in an

---

[7]In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on 30 September 1981.

attempt to surrender" -- as sufficient to create a fact issue about raised hands was error.[8]

ii.

According to the Hedge affidavit: "At no time did [Hedge] observe[9] that the driver of the red car tried to run the deputies over. At no time did [Hedge] observe the driver of the red car aim his vehicle at the deputies. At no time did the red car

---

[8]We are reminded of the Supreme Court's statement in <u>Butz v. Economou</u>, 438 U.S. 478, 98 S. Ct. 2894 (1978):

> [D]amage suits concerning constitutional violations need not proceed to trial, but can be terminated on a properly supported motion for summary judgment based on the defense of [qualified] immunity. In responding to such a motion, plaintiffs may not play dog in the manger; and firm application of the Federal Rules of Civil Procedure will ensure that . . . officials are not harassed by frivolous lawsuits.

<u>Id.</u> at 507-08, 98 S. Ct. at 2911 (discussing qualified immunity in <u>Bivens</u> action) (internal footnote and citation omitted). And we note that Plaintiff was represented by counsel who submitted the Hedge affidavit and that Plaintiff was on notice that Defendants -- they filed a motion to strike -- contested the admissibility of the "believe" statement. Plaintiff made no effort to strengthen the affidavit by dropping the reference to belief.

Plaintiff points us to no other admissible evidence supporting a finding that Davis raised his hands. And, Deputy Capobianco flatly testified at his deposition that he did not see Davis raise his hands. In addition, when asked, at his deposition, what he was shooting at, Deputy Clark testified that he could not see Davis's "face or anything like that. You know, it was all--it was all in the shadows. I was just aiming behind the steering wheel where a driver would be operating that vehicle from." No one in this case has sworn that Davis ever actually raised his hands.

We intimate not the slightest view about what the legal significance to this case would be if the record did support that Davis raised his hands.

[9]Hedge states, in the affidavit, that he "had a clear and unobstructed view of the events that transpired" in the cul-de-sac from the front porch of his house on the cul-de-sac.

9

appear to be a threat to any officer on the scene." The district court concluded that these statements created an issue of fact about whether Davis posed an immediate threat of serious physical harm to the officers in the cul-de-sac when he was shot.

We have accepted the first two above-quoted sentences as factual statements, although they are hotly contested.[10] But, we cannot accept that Hedge's opinion that "[a]t no time did the red car [Davis] appear to be a threat to any officer on the scene" is outcome determinative for summary judgment. Passing over the usual lurking problems of conclusory opinions in affidavits, the chief reason is that Hedge -- unlike the deputies -- did not know about the details of the spirited car chase leading up to the cars coming to the cul-de-sac. See United States v. City of Miami, 115 F.3d 870, 873 (11th Cir. 1997) (concluding that expert's opinion -- that vestiges of discrimination existed in city fire department -- was insufficient to support judgment finding that vestiges existed

---

[10]Although contrary to the remainder of the evidence in the case, we have based our rendition of the sequence of events in the cul-de-sac -- a rendition that is in the light most favorable to Plaintiff -- on Hedge's affidavit. Other evidence (including a videotape of the events taken by a camera mounted on Deputy Shepard's car and the deposition testimony of various officers on the scene) tends to show that Deputy Clark and Deputy Capobianco were in danger of being run-over by Davis. The videotape and testimony support that Davis's car, after it initially stopped in the cul-de-sac, backed towards the driver's side door of Deputy Capobianco's car and stopped just short (3 feet) of hitting Deputy Capobianco as he exited through that car door. That evidence also tends to show that, as Davis stopped his car, Deputy Clark (within tenths of a second) fired two shots at Davis. In addition, evidence supports that, after remaining stopped for less than a second, Davis's car accelerated forward towards Deputy Clark before more shots were fired.

10

because expert "did not take into account" certain facts and did not consider certain "legally relevant factors" upon which such an opinion must be based); Connell v. Bank of Boston, 924 F.2d 1169, 1177-78 (1st Cir. 1991) (concluding that opinion in lay witness affidavit -- that employer was "determined to eliminate . . . senior employees" -- was insufficient to prevent summary judgment for employer on plaintiff's age discrimination claim because affidavit pointed to insufficient specific facts to support such a "broad assertion"); Calhoun v. Honda Motor Co., 738 F.2d 126, 131-32 (11th Cir. 1984) (concluding that expert opinion at issue -- that plaintiff's brakes were wet -- was insufficient to support jury finding of causation [a finding that relied on brakes being wet] because expert witness had not considered enough of the relevant facts upon which opinion should have been based); United States v. Burns, 69 F.2d 636, 639 (5th Cir. 1934) (concluding that expert opinion on plaintiff's level of disability insufficient to support finding that plaintiff was totally disabled at relevant time because opinion did not take into account all the material facts disclosed by the evidence).[11] Hedge's observation

---

[11]That some of the above-cited cases involve expert opinions, not lay opinions, does not affect our reasoning. Opinions, be they expert or lay, are only as good as the evidence upon which they are based. Washington v. United States, 214 F.2d 33, 43 (9th Cir. 1954) (concluding that neither lay nor expert opinions supported jury verdict, in part, because "[o]pinion evidence is only as good as the facts upon which it is based" and facts, in the case, were insufficient to support opinions).

about the apparent threat is a conclusion that is inadequately supported.[12]  Hedge's opinion does not take into account legally material events that occurred at a time and place that Hedge could not observe: Davis's acts before and during the car chase.  Hedge's view of events at the cul-de-sac was not in context; it is incomplete.  So, even at the summary judgment stage, we need not accept Hedge's threat assessment as true and correct.  His conclusory opinion is inadequate to create an issue of fact about the objective danger -- in the light of all the circumstances -- posed by Davis at the time of the shooting, much less about the objective danger that a reasonable officer in Deputy Clark's or Deputy Capobianco's position -- considering all the circumstances -- would have perceived at the time of the shooting.

c.

Following the shooting, Davis's mother ("Plaintiff") filed suit against Deputy Clark and Deputy Capobianco, alleging a section 1983 excessive force claim and state law claims.  After discovery, the officers moved for summary

---

[12]Moreover, under the law, the threat of danger to be assessed is not just the threat to officers at the moment, but also to the officers and other persons if the chase went on.

judgment on qualified immunity grounds.  The district court denied the motion, and this appeal followed.

DISCUSSION

Excessive Force and the Fourth Amendment

At the outset,  we address whether the shooting of Davis, given the supposed circumstances, equals -- under the Fourth Amendment -- the use of excessive force in the course of arresting Davis.  For the Fourth Amendment, the touchstone for this inquiry is "objective reasonableness."  See Graham v. Connor, 109 S. Ct. 1865, 1867-68 (1989).  And, the "reasonableness" must be judged from the perspective of an officer on the scene.  Id. at 1872.  In addition, we must allow "for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation."  Id. at 1872.

Deadly force was used in this case.  And our look at the circumstances surrounding the use of that force must be a careful one.  Our study benefits from

13

the guidance of <u>Tennessee v. Garner</u>, 105 S. Ct. 1694 (1985), which deals with the use of deadly force:

> Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force. Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given.

<u>Id.</u> at 1701.

Briefly stated, the question then is whether, given the circumstances, Davis would have appeared to reasonable police officers to have been gravely dangerous. The answer is "Yes."

First, we conclude that -- given Davis's aggressive use of his automobile during the chase -- probable cause existed to believe Davis had committed a felony involving the threatened infliction of serious physical harm: aggravated assault per Georgia Code § 16-5-21.[13]

---

[13]"A person commits the offense of aggravated assault when he or she assaults ... [w]ith a deadly weapon or with any object, device, or instrument which, when used offensively against a person, is likely to or actually does result in serious bodily injury." Ga. Code Ann. § 16-5-21(a)(2) (2001). Section 16-5-20 of the Georgia Code defines an assault as "an act which places another in reasonable apprehension of immediately receiving a violent injury." Ga. Code Ann. § 16-5-20(a)(2) (2001).

14

Second, Davis, once he began the chase, never left his automobile or even turned the engine off. By the time of the shooting, Davis had used the automobile in a manner to give reasonable policemen probable cause to believe that it had become a deadly weapon with which Davis was armed. See Durrance v. State, 549 S.E.2d 406, 407-08 (Ga. Ct. App. 2001); Blalock v. State, 299 S.E.2d 753, 753-54 (Ga. Ct. App. 1983).

Given the facts in the light most favorable to Plaintiff, reasonable police officers could have believed that the chase was not over when the police fired on Davis. Even when we accept the Hedge affidavit as true that Davis's car, in the cul-de-sac, did not try to run over the deputies and that Davis, in the cul-de-sac, did not aim the car at the deputies, Davis's car was stopped for, at most, a very few seconds when shots were fired: no cooling time had passed for the officers in hot pursuit. Davis, while fleeing, had left the streets and driven through a residential yard before; so, that he had pushed the nose of his car to within 3 or 4 feet of a curb in the front of a home (as Hedge says) could mean little to the officers about whether the chase was finally over. And the police -- before shooting -- did yell to Davis to "get out of the car," which he never did.

Given the facts and circumstances of this case, we cannot conclude that the Fourth Amendment ruled out the use of deadly force.

## Qualified Immunity

In the alternative, the individual defendants are due immunity. See generally Saucier v. Katz, 121 S. Ct. 2151, 2158 (2001) (qualified immunity can protect an officer who behaved unreasonably in violation of the Fourth Amendment); Marsh v. Butler County, 268 F.3d 1014, 1030 n.8 (11th Cir. 2001) (en banc) (immunity is different from no liability on the merits).

Qualified immunity protects government officials, in their individual capacities, from suit unless the law preexisting the defendant official's supposedly wrongful act was already established to such a high degree that every objectively reasonable official standing in the defendant's place would be on notice that what the defendant official was doing would be clearly unlawful given the circumstances. See Lassiter v. Alabama A&M Univ., 28 F.3d 1146, 1149-1150 (11th Cir. 1994) (en banc). The notice may come in different ways. See Marsh, 268 F.3d at 1031 n.9 (government officials sued in their individual capacities under 42 U.S.C. § 1983 might not be entitled to qualified immunity even if no precedent with facts materially similar to those in the plaintiff's case). But the preexisting law must give real notice of practical value to government officials, considering the specific circumstances confronting them, and not just talk of some generalized,

abstract intellectual concept. "Public officials are not obligated to be creative or imaginative in drawing analogies from previously decided cases." Adams v. St. Lucie County Sheriff's Dept., 962 F.2d 1563, 1575 (11th Cir. 1992), approved en banc 998 F.2d 923 (11th Cir. 1993). "Unless a government agent's act is so obviously wrong, in the light of pre-existing law, that only a plainly incompetent officer or one who was knowingly violating the law would have done such a thing, the government actor has immunity from suit." Lassiter, 28 F.3d at 1149.

This case is based on the Fourth Amendment that prohibits "unreasonable searches and seizures." That "unreasonable" seizures are prohibited was clearly established before 1998. But, this proposition is too broad and general to give policemen practical guidance. The kind of notice that will take away qualified immunity must be appropriately specific considering the context of the case. See Saucier, 121 S. Ct. at 2156. So, case law must be looked to for the needed notice of what conduct is "unreasonable" within the meaning of the Fourth Amendment.

In this case, Plaintiff -- quite rightly -- points to Tennessee v. Garner and Graham v. Conner as important. They are important decisions; and we know that sometimes general rules of law in judicial decisions can give enough warning to government officials, in certain circumstances to which the general rules apply with "obvious clarity," that qualified immunity will be lost. But when we look at

17

decisions such as <u>Garner</u> and <u>Graham</u>, we see some tests to guide us in determining the law in many different kinds of circumstances; but we do not see the kind of clear law (clear answers) that would apply with such obvious clarity to the circumstances of this case that only an incompetent officer or one intending to violate the law could possibly fail to know that what the police did here violated federal law.

"The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application." <u>Graham</u>, 109 S. Ct. at 1872. Thus, as we almost always need to do in Fourth Amendment cases, we -- in this case -- must look at how the Fourth Amendment and the judge-made general rules of what the Fourth Amendment means and what it requires have been applied to specific sets of facts in other cases. We look at the cases to see if a bright line -- before the pertinent day -- had been established capable of giving fair warning to all objectively, reasonable officers standing in the defendants' places that shooting the decedent, in these circumstances, must violate federal law. We look for cases in which Fourth Amendment violations have been ascertained; and we look for fair warning, by studying whether the cases involved facts materially similar to those in this case: cases not fairly distinguishable from the case at hand. See <u>Marsh</u>, 268 F.3d at 1032-33.

As far as we know, no such preexisting case exists. Plaintiff has identified no case demonstrating a clearly established rule prohibiting police officers from using deadly force in circumstances like those in this case: a case, among other things, where the fleeing suspect appeared to be dangerous by virtue of his hazardous driving during the long, nighttime car chase and where the suspect remained in his automobile with the engine running, even when almost surrounded by officers and where -- IF the chase had ended at all -- it had ended (at most) a very few seconds before the officers fired and, even then, the suspect's car started driving away again, causing more shots to be fired.[14]

Because the preexisting law did not warn defendants fairly that shooting the decedent in these circumstances would clearly violate federal law, defendants -- if they violated federal law (which we strongly doubt) -- are entitled to immunity.

CONCLUSION

---

[14]The cases most like this case seem to indicate that the shooting was not unlawful at all. See Scott v. Clay County, 205 F.3d 867 (6th Cir. 2000); Smith v. Freland, 954 F.2d 343 (6th Cir. 1992); Puglise v. Cobb County, 4 F. Supp.2d 1172 (N.D. Ga. 1998).

19

Qualified immunity is an immunity from suit altogether. Therefore, the Supreme Court "repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation." Saucier, 121 S. Ct. at 2156 (quoting Hunter v. Bryant, 502 U.S. 224, 227, 112 S. Ct. 534 (1991)). In addition, we again stress that "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action." Celotex Corp. v. Catrett, 106 S. Ct. 2548, 2555 (1986) (quoting Fed. R. Civ. P. 1); see also supra note 8. Defendants moved for summary judgment on immunity grounds. The motion was denied in district court. But we think otherwise. On the federal claim, the individual defendants were due summary judgment, bringing the case against them to an end without delay.

REVERSED and REMANDED[15] for further proceedings consistent with this order.

---

[15]

### State Law

Because Plaintiff's state law assault and battery claims present complex issues of state law, we direct the district court to dismiss the state law claims without prejudice. See <u>Nolin v. Isbell</u>, 207 F.3d 1253, 1258 (11th Cir. 2000) (instructing district court, after reversing summary judgment and granting defendants qualified immunity at summary judgment stage, to dismiss state law claims involving complex state immunity issues without prejudice so that state court could address state law issues).

LAY, Circuit Judge, concurring specially:

I respectfully concur in the judgment of the majority. I agree that the two officers should be dismissed at the outset of this case under the doctrine of qualified immunity. I write separately, however, because my analysis differs somewhat from the majority's.

The only issue appealed to this court involves the question of qualified immunity. The notice of appeal filed on June 13, 2001, reads as follows:

> COME NOW the defendants Capobianco and Clark, in their individual capacities, and hereby appeal to the United States Court of Appeals for the Eleventh Circuit from the order of the District Court for the Southern District of Georgia entered in this case on May 22, 2001 which order denied the motion for summary judgment of the defendants Capobianco and Clark, in their individual capacities on the issue of qualified immunity.
>
> This appeal of the denial of the qualified immunity defense of the defendants Capobianco and Clark in their individual capacities is taken as a direct immediate appeal pursuant to Mitchell v. Forsyth, 472 U.S. 511, 105 S. Ct. 2806 (1985).

No other issue is before this court. We lack jurisdiction to entertain any other issue, such as the motion for summary judgment on Fourth Amendment grounds. Moreover, that issue, as well as other tangential issues addressed by the majority, were not briefed by the parties.

The threshold issue to be addressed in a situation like this is whether or not the facts *alleged* by the plaintiff make out a claim for a violation of a constitutional right.

22

See Saucier v. Katz, 533 U.S. 194, 121 S. Ct. 2151, 2156 (2001) ("A court required to rule upon the qualified immunity issue must consider, then, this threshold question: Taken in the light most favorable to the party asserting the injury, *do the facts alleged show* the officer's conduct violated a constitutional right?") (emphasis added) (citing Siegert v. Gilley, 500 U.S. 226, 232 (1991)).  In this instance, the plaintiff's claim is one of excessive force.  The defendants, however, did not appeal the district court's denial of summary judgment on the constitutional question; indeed, they could not in the context of an interlocutory appeal.  See Mitchell v. Forsyth, 472 U.S. at 527-28.  Thus, that issue is not before us.  Likewise, although the district court passed on the question as to whether there was a factual dispute that had to be resolved under summary judgment, that issue also is not before us.

I think the proper course of action under these circumstances is to follow the Supreme Court's approach in Saucier; the Court found they did not have jurisdiction over the question of a constitutional violation and, as such, simply assumed one existed.  See Saucier at 2159 ("Because we granted certiorari only to determine whether qualified immunity was appropriate, however, and because of the limits imposed upon us by the questions on which we granted review, we will assume a constitutional violation could have occurred under the facts alleged based simply on the general rule prohibiting excessive force, then proceed to the question whether this

23

general prohibition against excessive force was the source for clearly established law that was contravened in the circumstances this officer faced."). In the same manner, we should simply assume plaintiff states a claim of a constitutional violation on the facts alleged–the decedent was shot dead by the officers surrounding him, having already surrendered with raised hands–regardless of their provability, and move immediately to address whether these officers violated clearly established constitutional law under the circumstances they faced.

To urge, as the majority does, that Saucier's threshold question requires a court to resolve a constitutional dispute on a developed factual record defeats the very purpose of qualified immunity. Qualified immunity is more than "a mere defense to liability." Hunter v. Bryant, 502 U.S. 224, 227 (1991) (quoting Mitchell, 472 U.S. at 526); see also Marsh v. Butler, 268 F.3d 1014, 1030 n.8 (11th Cir. 2001) (en banc). The Supreme Court designed qualified immunity to absolve government officials from any prolonged litigation practices; it serves to bar a plaintiff who would haul government officials into court and subject them to extensive discovery and summary judgment proceedings. See Siegert v. Gilley, 500 U.S. at 232-33; Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). It is a question of law that must be decided first and foremost.

Thus I would address only the question of law whether plaintiff's allegations demonstrate a contravention of clearly established law. In the present case, the shooting was immediately preceded by an extended police chase, marked by the decedent's extremely reckless flight. While the decedent was partially surrounded, and assuming he raised his hands a moment before being shot, there is no dispute that his vehicle accelerated in the deputies' direction just before they fired. I am reminded of the facts the Supreme Court confronted in Saucier and in Graham v. Connor, 490 U.S. 386, 396-97 (1988), wherein the Court said: "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments–in circumstances that are tense, uncertain, and rapidly evolving–about the amount of force that is necessary in a particular situation."

Here, deputies Clark and Capobianco literally had to make a split-second decision whether or not to fire their weapons at the conclusion of a dangerous chase. As the majority points out, there are no precedential cases demonstrating a clearly established prohibition against officers using deadly force in similar circumstances. The Court's instruction in Connor should make it clear that the deputies acted as any reasonable officer would have under the factual circumstances involved; they are entitled to qualified immunity.

I would find that we have jurisdiction to decide the question of qualified immunity and no other. Consequently, I concur only in the portion of the court's opinion which holds that the officers are protected by the bar of qualified immunity.