[DO NOT PUBLISH]


IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 15-13732
_____

D.C. Docket No. 1:13-cv-00920-WHA-SRW

KATHERINE THOMAS,
individually, and as the administrator of the estate of
Christopher Jerome Thomas,

                                                    Plaintiff-Appellant,

versus

DARREN MOODY,
in his individual capacity,
CITY OF DOTHAN, ALABAMA,

                                                    Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Alabama
_____

(June 24, 2016)

Before HULL and BLACK, Circuit Judges, and ROTHSTEIN,[*] District Judge.

PER CURIAM:

In this 42 U.S.C. § 1983 action, Katherine Thomas ("the Plaintiff"), individually and as the administrator of the estate of Christopher Thomas ("Thomas"), appeals the district court's grant of summary judgment on the basis of qualified immunity in favor of Defendant Darren Moody, a Dothan, Alabama police officer. After careful review of the record and with the benefit of oral argument, we affirm.

## I.    FACTS

Because this appeal arises from the grant of Defendant Officer Moody's motion for summary judgment, we recount the relevant facts in the light most favorable to the non-moving Plaintiff. See Lee v. Ferraro, 284 F.3d 1188, 1190 (11th Cir. 2002).

On June 28, 2012, Officer Moody was training Probationary Officer Mitch Murkerson inside of a marked police vehicle on a residential street in Dothan, Alabama. At approximately 3:50 P.M., Thomas drove past Officer Moody in a white Ford Explorer ("the Explorer"). Officer Moody caught a glimpse of Thomas and mistook him for Jerome Hill, an individual who was the subject of an active arrest warrant for domestic violence.

---

[*]Honorable Barbara Jacobs Rothstein, United States District Judge for the Western District of Washington, sitting by designation.

Believing the driver of the Explorer might be Hill, Officer Moody turned his patrol vehicle around and began pursuing Thomas in order to conduct an investigatory stop and ascertain the identity of the driver. Officer Moody activated his siren and emergency lights, but Thomas accelerated away from Officer Moody.

A high-speed chase through the residential streets of Dothan ensued, which was recorded by the dashboard camera in Officer Moody's car. The posted speed limit on several of the residential streets was 25 miles per hour. At times, the Explorer reached speeds of nearly 60 miles per hour.

The dashcam video shows that Thomas made five wide or reckless turns onto residential streets in an attempt to elude Officer Moody. The dashcam video also shows that Thomas ran through four stop signs, including one intersection with a flashing red light. At the intersection with the flashing red light, another car with the right-of-way had entered the intersection but stopped abruptly to avoid a collision with Thomas. Thomas sped through the intersection, swerving sharply. Officer Moody called out on the police radio that he was pursuing the Explorer. Officer Ronald Hall heard the call and joined the pursuit.

At some point, Thomas turned sharply into a strip mall parking lot at a dangerous speed. Continuing at a high rate of speed, Thomas drove near the sidewalk in front of the strip mall storefronts, where pedestrians were present. Next, Thomas turned to the right and drove directly toward a car in the parking lot,

3

which was the unmarked police vehicle of Officer Hall, who by that point had entered the parking lot. After passing Officer Hall's car, Thomas began circling around other parked cars in the parking lot in a figure eight pattern at a high rate of speed. The dashcam video shows the Explorer's tires producing smoke and black tread marks as Thomas drove and swerved about at a high rate of speed in the parking lot.

Thomas's dangerous and erratic driving in the parking lot caused several individuals in the vicinity to fear for their safety. Philip Foster and his 16-year-old son were inside one of the parked cars in the strip mall parking lot and feared that Thomas would hit and injure them. Foster's wife was standing in front of one of the strip mall stores. She observed Thomas's aggressive driving and feared that her children and husband could be hurt. Another witness from across the street who observed Thomas driving in the parking lot worried that Thomas would run over and kill someone.

After swerving around in the parking lot, Thomas abruptly stopped his vehicle facing a parked car. Officer Moody stopped his car beside the driver's side of the Explorer. Officer Hall stopped his car beside the passenger's side of the Explorer. At this point, all three cars were stopped with the two police officers' cars on each side of the Explorer and a parked car in front of the Explorer.

Believing that the chase was over, Officer Moody exited his car and drew his gun.  But the chase was not over.  When Officer Moody exited his car, Thomas put the Explorer in reverse gear, spun the tires, accelerated in reverse at a high rate of speed, crossed an aisle in the parking lot, and crashed into a parked car approximately 15 to 25 feet behind him.[1]  The pictures in the record show that the collision caused extensive damage to the passenger's side of the parked car.  At this point, Thomas had fled from Officer Moody at high speeds through residential streets, run through four stop signs, almost hit a car when running through a stop sign at an intersection with a flashing red light, swerved dangerously with his tires smoking through the parking lot with pedestrians present, and crashed into a parked car in the parking lot while accelerating in reverse.

Believing for a second time that the chase was over, Officer Moody moved towards the Explorer with his gun drawn and pointed at Thomas.  Officer Moody shouted at Thomas to exit the Explorer.  The Explorer was stationary for a moment—at most, a few seconds—but Thomas did not turn off the engine or raise his hands.[2]

Seconds after exiting his car, and after Thomas crashed into the parked car, Officer Moody opened fire, shooting Thomas five times in the side of his neck and

---

[1]The parked car was empty at the time of the crash.

[2]Some witnesses even stated that Thomas, after crashing into the parked car, tried to place the Explorer in forward gear.

chest. Officer Moody was standing next to the driver's side door of the Explorer when he began shooting Thomas. Though its engine was still running, the Explorer was momentarily stationary when Officer Moody began shooting Thomas.[3]

After Officer Moody shot Thomas, the Explorer accelerated forward, crossed a busy street, and crashed through the wall of a nearby building.

## II.    PROCEDURAL HISTORY

On June 12, 2014, the Plaintiff filed a four-count amended complaint in federal district court against Officer Moody and the City of Dothan, alleging causes of action under federal and state law. The Plaintiff brought the following claims against Officer Moody: (1) Fourth Amendment violation under 42 U.S.C. § 1983 (Count I); and (2) wrongful death under Alabama state law (Count II). The Plaintiff brought the following additional claims against the City of Dothan under Alabama state law: (1) neglectfulness, unskillfulness, or carelessness (Count III); and (2) negligent hiring (Count IV).

In an August 12, 2015 order, the district court granted summary judgment in favor of Officer Moody with respect to the Plaintiff's § 1983 claim on the basis of

---

[3]According to Officer Moody, he was in front of the Explorer and Thomas put the Explorer in forward gear and began driving toward him. Officer Moody testified that, fearing for his safety, he stepped slightly to his right to avoid the Explorer and, as the Explorer approached, fired four shots at Thomas. But reviewing the record in the light most favorable to the Plaintiff, Officer Moody (1) was on the driver's side of the Explorer when he opened fire on Thomas, and (2) having just crashed into the parked car, the Explorer was momentarily stationary when he opened fire on Thomas.

qualified immunity. The district court declined to exercise supplemental jurisdiction over the remaining state law claims and dismissed them without prejudice.

## III.    DISCUSSION

We review <u>de novo</u> a district court's ruling on a summary judgment motion based on qualified immunity. <u>McCullough v. Antolini</u>, 559 F.3d 1201, 1204 (11th Cir. 2009). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[G]enuine disputes of facts are those in which the evidence is such that a reasonable jury could return a verdict for the non-movant." <u>Mann v. Taser Int'l, Inc.</u>, 588 F.3d 1291, 1303 (11th Cir. 2009) (quotation marks omitted). "For factual issues to be considered genuine, they must have a real basis in the record." <u>Id.</u> (quotation marks omitted). "[M]ere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." <u>Ellis v. England</u>, 432 F.3d 1321, 1326 (11th Cir. 2005).

Section 1983 supplies a remedy to a plaintiff "who can prove that a person acting under color of state law committed an act that deprived [him] of some right, privilege, or immunity protected by the Constitution or laws of the United States." <u>Hale v. Tallapoosa Cty.</u>, 50 F.3d 1579, 1582 (11th Cir. 1995). For government

7

officials sued in their individual capacities under § 1983, "[q]ualified immunity offers complete protection . . . if [the officials'] conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Grider v. City of Auburn, 618 F.3d 1240, 1254 (11th Cir. 2010) (quotation marks omitted).

"The initial inquiry in a qualified immunity case is whether the public official proves 'that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.'" Id. at 1254 n.19 (quoting Lee, 284 F.3d at 1194). If so, the court must ascertain: (1) "whether the plaintiff's allegations, if true, establish a constitutional violation," and (2) "whether the right violated was 'clearly established.'" Id. at 1254. This analysis may be done in the order most appropriate for the case. Id.

In assessing the clearly-established prong, we ask if it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. Vinyard v. Wilson, 311 F.3d 1340, 1350 (11th Cir. 2002). Thus, a plaintiff must show either (1) that a materially similar case has already been decided, giving notice to the police; (2) that a broader, clearly established principle should control the novel facts in this situation; or (3) that this case fits within the exception of conduct which so obviously violates the Constitution that prior case law is unnecessary. Keating v. City of Miami, 598 F.3d 753, 766 (11th Cir. 2010).

The "salient question" is whether the state of the law at the time of the incident gave Officer Moody "fair warning" that his conduct was unlawful. See Hope v. Pelzer, 536 U.S. 730, 741, 122 S. Ct. 2508, 2516 (2002).

With respect to the constitutional violation prong, the U.S. Supreme Court's decisions in Tennessee v. Garner, 471 U.S. 1, 105 S. Ct. 1694 (1985) and Graham v. Connor, 490 U.S. 386, 109 S. Ct. 1865 (1989), "establish that claims of excessive force are to be judged under the Fourth Amendment's 'objective reasonableness' standard." Brosseau v. Haugen, 543 U.S. 194, 197, 125 S. Ct. 596, 568 (2004) (quotation marks omitted). In Garner, the Supreme Court explained that it is unreasonable for an officer to "seize an unarmed, nondangerous suspect by shooting him dead," but that "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." 471 U.S. at 11, 105 S. Ct. at 1701.

This Court "must engage in an objective inquiry to determine the reasonableness of an officer's actions in an excessive force case: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Perez v. Suszczynski, 809 F.3d 1213, 1219 (11th Cir. 2016) (quotation marks omitted). The Supreme Court has repeatedly cautioned that

9

"[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 396-97, 109 S. Ct. at 1872.

An officer may use deadly force without violating the constitution when a car that is being used as a deadly weapon threatens his life or the life of another or presents a risk of serious bodily injury. See McCullough, 559 F.3d at 1207-08. For example, in Pace v. Capobianco, 283 F.3d 1275 (11th Cir. 2002), the decedent led police on a high-speed chase, swerving and nearly hitting other motorists. Id. at 1277. The pursuit ended in a cul-de-sac, where police cars blockaded the decedent's car on three sides. Id. at 1277-78. Within "a moment of [the decedent's] car stopping (at most, a very few seconds)," an officer fired two shots through the decedent's front windshield. Id. at 1278. At the "same time" shots were fired, the decedent's car began moving forward. Id. "The whole event at the cul-de-sac was a matter of seconds." Id.

This Court concluded that the use of deadly force in Pace was reasonable because the decedent "would have appeared to reasonable police officers to have been gravely dangerous" at the time of the shooting, based on his dangerous

10

driving as well as his failure to heed police warnings.  Id. at 1281-82.  This Court noted:

> Plaintiff  has identified no case demonstrating a clearly established rule prohibiting police officers from using deadly force in circumstances like those in this case: a case, among other things, where the fleeing suspect appeared to be dangerous by virtue of his hazardous driving during the long, nighttime car chase and where the suspect remained in his automobile with the engine running, even when almost surrounded by officers and where—IF the chase had ended at all—it had ended (at most) a very few seconds before the officers fired and, even then, the suspect's car started driving away again, causing more shots to be fired.

Id. at 1283.

The Plaintiff argues that the officers in Pace did not shoot the decedent until after the decedent began moving his vehicle towards the officers.  That is not correct.  In Pace, the officers opened fire at the "same time" that the decedent's vehicle began moving forward, not after.  Id. at 1278.

In Robinson v. Arrugueta, 415 F.3d 1252 (11th Cir. 2005), the decedent refused to surrender to police and instead drove towards a free-standing officer at approximately one to two miles per hour.  Id. at 1254.  The officer was only a few feet away from the decedent's car, and there was a parked car directly behind him. Id.  To avoid being pinned, the officer shot through the windshield and killed the decedent.  Id.  This Court affirmed the grant of qualified immunity and stated, "[e]ven if in hindsight the facts show that [the officer] perhaps could have escaped unharmed, we conclude that a reasonable officer could have perceived that [the

11

decedent] was using the [car] as a deadly weapon," and, therefore, "[the officer] had probable cause to believe that [the decedent] posed a threat of serious physical harm." Id. at 1256.

In McCullough v. Antolini, 559 F.3d 1201 (11th Cir. 2009), the decedent led the police on a high-speed chase before pulling his truck into a shopping center parking lot. Id. at 1203. When the decedent's truck came to a stop, a police officer exited his car, drew his weapon, and ordered the decedent to put his hands up. Id. The driver did not show his hands or respond to the officer's command. Id. Instead, the decedent revved the engine of his truck, at which point the officer shot the decedent. Id. This court concluded that the officer was entitled to qualified immunity because "[the decedent] used his vehicle in a dangerous and aggressive manner which provided the officers with probable cause to believe that [the decedent], while driving his truck, posed a threat of serious physical harm or death to the officers, or other passersby." Id. at 1208.

On this particular record, the district court did not err by granting qualified immunity to Officer Moody. As an initial matter, we reject the Plaintiff's claim that there are any genuine disputes of material fact. The district court resolved in favor of the Plaintiff the ambiguity concerning whether Thomas was stationary or driving forward when Officer Moody shot him, and whether Moody was standing to the side of or in front of Thomas's car. The Plaintiff also claims that Thomas

12

attempted to surrender, but she relies entirely on an unsupported, conclusory statement not based on personal knowledge. Because mere conclusions and unsupported factual allegations are insufficient to create genuine issues of material fact, the district court did not err in concluding that there was no evidence that—much less a genuine dispute of material fact about whether—Thomas attempted to surrender. See Ellis, 432 F.3d at 1326-27.

Under the facts and circumstances of this case, which includes video evidence, we cannot say that Officer Moody violated Thomas's' constitutional rights by using objectively unreasonable force. As in Pace, Robinson, and McCullough, Thomas's aggressive and dangerous driving threatened serious harm to other citizens and the officers as he drove through four stop signs, almost hitting one car, and as he drove through the parking lot. That threat escalated when Thomas rammed into a parked car as the officers closed in. Indeed, the Plaintiff admits that, even though the Explorer was stationary for a moment (as most, a few seconds), Thomas never turned off the engine, never attempted to exit the Explorer, and never raised his hands.

The Plaintiff contends that Officer Moody's use of deadly force was unreasonable because Officer Moody believed that the chase was over after Thomas rammed into the parked car, and, at the moment he opened fire on Thomas, the chase was, in fact, over. This argument is unavailing. Officer Moody

13

testified that he first thought the chase was over when Thomas stopped in front of a parked car and Officers Moody and Hall stopped their patrol cars on the sides of the Explorer. But Thomas then put the car into reverse gear, accelerated, and hit another parked car with the rear end of the Explorer. After the crash, Officer Moody again thought that the chase was over and yelled at Thomas to exit the Explorer. Thomas did not turn off the engine, raise his hands, or do anything else to surrender. Indeed, when Officer Moody opened fire, the Explorer's engine was still running, and the Explorer then sped forward.

In any event, we must engage in an objective inquiry to determine the reasonableness of an officer's actions in an excessive force case, and we consider whether Officer Moody's actions were objectively reasonable without regard to his underlying intent, motivation, or beliefs. See Perez, 809 F.3d at 1219; see also Brown v. City of Huntsville, 608 F.3d 724, 738 (11th Cir. 2010) ("We judge use of force solely on an objective basis, and we do not consider an officer's subjective belief.") In doing so, we must evaluate Officer Moody's conduct in light of all facts and circumstances that confronted him. Id.

Given this standard, we cannot say that Officer Moody's actions were objectively unreasonable under the circumstances he faced. The Plaintiff's focus on the few seconds before Officer Moody opened fire ignores the critical events leading up to that moment: Thomas's failure to pull over, the high-speed chase

14

through residential streets, Thomas's narrow avoidance of a collision, Thomas's failure to stop in the parking lot next to a busy street, and Thomas's continued erratic driving in that parking lot that caused bystanders and officers to fear for their own safety and for the safety of others, including children, all evidencing Thomas's repeated unwillingness to surrender despite the danger he posed to the public. Under the circumstances, it was objectively reasonable to believe that the chase was not over even after Thomas rammed into the parked car. Indeed, it had previously appeared that the chase was over when the police boxed in the Explorer, but Thomas proved that assumption wrong. Because it was objectively reasonable for a police officer to believe that Thomas continued to pose a dangerous threat to the public even after he crashed into the parked car, deadly force was warranted.

Even if we accept that in hindsight the chase was technically "over" after Thomas crashed into the parked car, Officer Moody's use of deadly force in the seconds following the crash was still objectively reasonable. This Court has held that deadly force is warranted "where the fleeing suspect appeared to be dangerous by virtue of his hazardous driving . . . and where the suspect remained in his automobile with the engine running, even when almost surrounded by officers and where . . . the chase had ended . . . a very few seconds before the officers fired."

15

Pace, 283 F.3d at 1283 (emphasis added).[4]  That is precisely what happened in this case.  Thomas appeared to be dangerous by virtue of his hazardous driving, he remained in the Explorer with the engine running, even when almost surrounded by officers, and he had crashed the Explorer only a few seconds before Officer Moody fired.  As in Pace, deadly force was not objectively unreasonable under these circumstances.  See id.

Even if the Plaintiff did establish that a federal constitutional violation occurred, which she did not, that federal law was not clearly established at the time that Thomas used his car as a dangerous weapon.  We cannot say that Officer Moody had fair warning that his conduct was unlawful in the dangerous situation he confronted.  Vinyard, 311 F.3d at 1350; Hope, 536 U.S. at 741, 122 S. Ct. at 2516.  If anything, the prevailing law in this Circuit at the time of Thomas's death affirmatively provided that Officer Moody's actions were objectively reasonable. See Pace, 283 F.3d at 1283.

In sum, Officer Moody's use of deadly force did not violate Thomas's constitutional rights.  Moreover, on June 28, 2012, it was not clearly established

---

[4]On this record, this case is unlike Morton v. Kirkwood, 707 F.3d 1276 (11th Cir. 2013), "where the plaintiff did not use or did not threaten to use his car as a weapon," id. at 1283, and also unlike Vaughan v. Cox, 343 F.3d 1323 (11th Cir. 2003), where the decedent's escape "did not present an immediate threat of serious harm to [the deputy] or others on the road," in part, because the decedent's lane of traffic was clear and he had made no aggressive moves to change lanes before being shot. Id. at 1230.  Further, Morton could not have provided Moody with notice of a clearly established rule, since Morton was not decided until 2013, after the 2012 events at issue in this case.

16

that Officer Moody was prohibited from using deadly force against Thomas under the circumstances of this case.  Because Moody violated no constitutional right, let alone a clearly established one, we conclude that he is entitled to qualified immunity.

   **AFFIRMED.**