[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 16-15533
_____

D.C. Docket No. 6:15-cv-00345-RBD-TBS


JACQUELINE M. SPENCER,
Individually and as Personal Representative of Marquis
Spencer, deceased,

                                            Plaintiff - Appellant,


versus


CITY OF ORLANDO, FLORIDA,
MICHAEL ZAMBITO,
Officer,
PAUL EVANCOE,
Officer,

                                            Defendants - Appellees.


_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(March 1, 2018)

Before MARCUS, MARTIN, and NEWSOM, Circuit Judges.

PER CURIAM:

Jacqueline Spencer appeals a district court order granting summary judgment against her and rejecting her claims arising out of the police-involved shooting death of her son, Marquis Spencer. Jacqueline principally contends that the district court erred in rejecting her claims against the City of Orlando and two of its police officers on the ground that the officers did not violate Marquis' Fourth Amendment right to be free from excessive force. She also asserts that the district court erred in dismissing her state-law wrongful-death claims on the ground that Florida law does not recognize a theory of negligent infliction of excessive force. Finding no ground for reversal, we affirm.

## I

On a May evening in 2013, while working in an unmarked Ford Explorer, Orlando Police Department Officers Michael Zambito and Paul Evancoe observed three men pull into a 7-11 parking lot in a blue Hyundai. The men were later identified as Marquis Spencer, Ronmono Carson, and Aaron Beavers. The officers thought the men were acting suspiciously, so they decided they would "wait for [the men] to leave the gas station, [] stop them, [and] see what [they were] up to." While the officers waited, Evancoe called for backup and Officers Florin and Bigelow responded to the call.

2

As the men exited the 7-11 parking lot—with Marquis driving—Evancoe noticed that the Hyundai failed to come to a complete stop and that none of its occupants were wearing seatbelts.[1]  Zambito activated the Explorer's emergency lights and initiated a traffic stop in the right-turn lane of a nearby intersection. Zambito positioned the Explorer closely behind the Hyundai while Florin positioned his truck in front, creating what the officers described as a "soft block."

Evancoe exited the passenger side of the Explorer with a flashlight in his hand and his gun holstered.  He was wearing a vest that said "POLICE" in large white letters across the front.  As Evancoe approached the Hyundai's passenger side, Marquis suddenly reversed the vehicle in Evancoe's direction, hit the Explorer, and maneuvered around Florin's truck.  Evancoe scrambled back into the Explorer, and the officers commenced pursuit.

During that pursuit, Florin positioned his truck parallel to the passenger side of the Hyundai while Zambito drove his Explorer directly behind it.  At an intersection, Zambito hit the rear of the Hyundai with his Explorer, causing the Hyundai to lose traction and hit Florin's truck.  All three vehicles came to a stop, with the Hyundai's front bumper now perpendicular to Florin's truck.

---

[1] While Carson testified that the men came to a complete stop when exiting the 7-11 lot, he also testified that he could not remember whether they were wearing seatbelts.  As the officers had probable cause to stop the vehicle based on the seatbelt violation, the original traffic stop was lawful no matter the officers' actual motivations.  *See Whren v. United States*, 517 U.S. 806, 813 (1996).

At that point, (1) Evancoe exited the Explorer and approached the passenger side of the Hyundai, (2) Florin attempted to exit his truck, and (3) Carson fled the Hyundai with a gun. With the Hyundai between the two vehicles, Zambito lost sight of Florin as he exited his truck. Zambito testified that he then heard the Hyundai's engine rev and saw it lurch forward in what he thought was Florin's direction. Carson disputes Zambito's account. He says that Marquis tried to re-crank the Hyundai but that the car wouldn't restart after it stalled when it was struck by the Explorer. After that, Zambito "fired several rounds … to prevent Florin from being killed." Evancoe heard the shots and saw Carson sprinting from the Hyundai, gun in hand.

Evancoe worked his way around to the driver's side of the Hyundai, where he saw Marquis sitting in the in the driver's seat with his left hand on the wheel and his right hand out of sight. He ordered Marquis not to move. Marquis instead lowered his hand from the steering wheel and lunged down, prompting Evancoe to fire six shots in his direction. Almost immediately thereafter, Evancoe heard a round of gunfire between Bigelow and Carson. Bigelow shot Carson once from behind.

Evancoe instructed Beavers to exit the Hyundai's back seat, and he obliged. Evancoe and other officers then extracted Marquis from the car and initiated chest

4

compressions, but he died at the scene.  In a subsequent search, officers discovered a loaded gun in the Hyundai's glove compartment.

Jacqueline Spencer filed a complaint under 42 U.S.C. § 1983 and Florida law, alleging that the officers violated Marquis' Fourth Amendment right to be free from excessive force and were liable for wrongful death, and that the City of Orlando's policies, customs, or procedures were a cause of Marquis' death.  The district court granted summary judgment for the defendants on all claims, holding that qualified immunity barred Jacqueline's Section 1983 claims against the officers, that there was no basis for the municipal-liability claim against the City, and that Florida law does not recognize a cause of action for negligent infliction of excessive force.  This appeal followed.[2]

## II

To avoid personal liability under Section 1983, law enforcement officers may invoke the defense of qualified immunity.  *See Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  The defense shields government officials sued in their individual capacities from suit for actions taken while performing a discretionary function so

_____

[2] We review a district court's grant of summary judgment *de novo*.  *See Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1242 (11th Cir. 2002).  Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c).  "We view the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion and all reasonable doubts about the facts are resolved in favor of the non-movant."  *Bailey*, 284 F.3d at 1243 (quotation marks and alterations omitted).

long as their conduct does not violate a "clearly established" constitutional right. *See Snider v. Jefferson State Cmty. Coll.*, 344 F.3d 1325, 1327 (11th Cir. 2003).

In order to receive qualified immunity, a defendant must first demonstrate that he was acting within the scope of his discretionary authority when the contested action occurred. *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002). When, as here, that much is undisputed, the burden shifts to the plaintiff to show that qualified immunity is unwarranted. *Id.* In order to meet her burden here, Jacqueline must show both (1) that the officers violated Marquis' Fourth Amendment rights and (2) that at the time the incident occurred the law "clearly established" the illegality of the officers' conduct. *See Pearson*, 555 U.S. at 232.

In determining whether Marquis' Fourth Amendment rights were violated, "the question is whether the officers' actions [were] objectively reasonable [given] the facts and circumstances confronting them …." *Carr v. Tatangelo*, 338 F.3d 1259, 1267 (11th Cir. 2003) (quotation marks omitted). An action's reasonableness is judged "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). In conducting this analysis, we must make "allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 397.

6

In *Graham*, the Supreme Court articulated three factors to guide a reviewing court's determination whether an officer's actions were reasonable under the circumstances. In particular, the court must consider "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*. at 396. In the circumstances of this case, the *Graham* factors demonstrate that the officers' actions were not objectively unreasonable.

## A

Our precedent makes clear that under the first *Graham* factor—the severity of the crime at issue—we must assess the reasonableness of an officer's use of force by examining the circumstances at the time of the officer's actions, not the time of his initial encounter with the suspect. *See Pace v. Capobianco* 283 F.3d 1275, 1276-82 (11th Cir. 2002). In *Pace*, which also involved a use of deadly force against the driver of a vehicle, we determined that probable cause existed to make an arrest for "aggravated assault" where the suspect, having initially been stopped for a minor traffic infraction, fled from officers in his car, which he used aggressively during the ensuing chase. *Id*. at 1282. We analyzed the reasonableness of the officer's subsequent use of deadly force in light of the suspect's aggravated assault with his vehicle—not the original traffic violation—and found that the officer's actions were not unreasonable. In doing so, we

7

emphasized, in particular, that the suspect "had used the automobile in a manner to give reasonable policemen probable cause to believe that it had become a deadly weapon." *Id.*

This case is similar. Although the justification for the initial stop was a seatbelt violation, the officers did not utilize any force against Marquis—let alone any deadly force—until after he had aggressively backed his car toward Evancoe, hit the officers' Explorer, and sped away. In light of his aggressive driving, it was not unreasonable for the officers to conclude—as in *Pace*—that Marquis had engaged in an aggravated assault by using his car as a deadly weapon. *Cf.* Fla. Stat. § 784.021.

**B**

Our cases also make clear that, under the circumstances, the threat that the officers faced here was sufficiently "immediate" to warrant deadly force. Indeed, we have "consistently upheld an officer's use of force and granted qualified immunity in cases where the decedent used or threatened to use his car as a weapon to endanger officers or civilians immediately preceding the officer's use of deadly force." *McCullough v. Antolini*, 559 F.3d 1201, 1207 (11th Cir. 2009) (officers' use of deadly force not unreasonable after suspect drove in threatening manner even though original traffic stop was only for excessive window tint).

8

What we have said before in similar circumstances applies here:  "Even if in hindsight the facts show that [the officers] could have escaped unharmed … a reasonable officer could have perceived that [Marquis] was using [his car] as a deadly weapon," and thus the officers "had probable cause to believe that [Marquis] posed a threat of serious physical harm."  *Robinson v. Arrugueta*, 415 F.3d 1252, 1256 (11th Cir. 2005).

For instance, in *Robinson*, we held that an officer's use of deadly force was reasonable even though the suspect's vehicle was traveling only a few miles per hour and the officer likely could have gotten out of the way before being hit.  *See* 415 F.3d at 1256.  Likewise, in *Long v. Slaton*, we held that an officer's use of deadly force was reasonable even where the suspect (who was admittedly mentally unstable) was backing a stolen police car *away* from the officer at time of the shooting.  508 F.3d 576, 579–81 (11th Cir. 2007).

Here, "from the perspective of the reasonable officer on the scene," *Graham*, 490 U.S. at 396, Marquis both used and threatened to use his car as a weapon immediately preceding the officers' use of force.  Before a single shot was fired, Marquis backed his car in the direction of Evancoe and hit the officers' Explorer as he tried to flee.  Moreover, even if the Hyundai was disabled after later spinning out—as the most favorable characterization of the evidence suggests—it is undisputed that, at the very least, Marquis attempted to restart the engine so that he

could continue his perilous flight.  Under our precedent, and under the particular circumstances here, it was not unreasonable for the officers to conclude that Marquis remained an "immediate" threat to their safety at the time they opened fire.[3]

To be clear, the officers were not required to wait until Marquis successfully restarted the car and drove toward them before they defended themselves.  In *Long*, again dealing with a similar use of deadly force, this Court held that "[e]ven if we accept that the threat posed by [the suspect] to [the officer] was not immediate in that the cruiser was not moving toward [the officer] when shots were fired, the law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act to stop the suspect."  508 F.3d at 581; *see also Pace*, 283 F.3d at 1282 (officer's use of force reasonable even though suspect did not drive toward him at time of shooting).  Similarly, it was not unreasonable for the officers here to fire before Marquis—who was by all accounts trying to restart the Hyundai—moved the car toward them.

---

[3] *Morton v. Kirkwood*, 707 F.3d 1276 (11th Cir. 2013), on which Jacqueline relies, is distinguishable.  There, we found that an officer's use of deadly force was excessive where he "had no probable cause to believe [that the suspect had] committed any crime, let alone a serious crime involving the infliction or threatened infliction of serious physical harm," and there was "no reason to believe that the man would place anyone's safety in danger."  *Id.* at 1281-82.  For reasons explained in text, that is not this case.

## C

Finally, the officers' use of deadly force here occurred while Marquis was actively attempting to evade arrest by flight.  After being spun out, he (at the very least) attempted to restart the Hyundai.  Thus, the third *Graham* factor is met here, as well.  *Cf. Mobley v. Palm Beach Cty. Sheriff Dep't*, 783 F.3d 1347, 1355 (11th Cir. 2015) (holding that officer's use of force was objectively reasonable in part because plaintiff "was a fleeing suspect who had struck a police officer with his truck and then led police on a reckless, high-speed chase," and then continued to act in a way that an officer could interpret to be "a continuing attempt to evade capture").

\* \* \*

Under the *Graham* factors, as applied to the particular circumstances here, the district court correctly determined that the officers did not act unreasonably.  As their actions were not objectively unreasonable, the officers did not violate Marquis' Fourth Amendment rights.  The district court was correct to grant summary judgment for the officers.[4]

---

[4] On appeal, Jacqueline argues for the first time that the officers' "soft block" of Marquis' vehicle for a seatbelt violation constitutes excessive force.  We need not consider this claim. "This circuit and the former Fifth Circuit have consistently held that a court will not consider on appeal for the first time a question that requires development of factual issues." *Troxler v. Owens-Illinois,* 717 F.2d 530, 533 (11th Cir. 1983).  As consideration of this

11

## II

Jacqueline separately appeals the district court's dismissal of her Section 1983 claim against the City of Orlando.  As did the district court, we conclude that because Marquis' constitutional rights were not violated, Jacqueline's claims against the City also necessarily fail.  *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986).

## III

Finally, Jacqueline appeals the district court's dismissal of her state-law wrongful-death claims, which rely on a negligence theory.  But as the district court recognized, this Court has previously held that "it is inapposite to allege the negligent commission of an intentional tort, such as the use of excessive force." *Lewis v. City of West Palm Beach*, 561 F.3d 1288, 1294 (11th Cir. 2009); *see also City of Miami v. Sanders*, 672 So. 2d 46, 48 (Fla. 3d DCA 1996) ("The concept of a cause of action for 'negligent' excessive force is an oxymoron …."). Thus, the district court correctly dismissed Jacqueline's wrongful-death claim.

---

argument would necessarily involve "slosh[ing] our way through the factbound morass of reasonableness," *Scott v. Harris*, 550 U.S. 372, 383 (2007) (quotation marks omitted), we will not consider it.

* * *

Having found no grounds for reversal, we **AFFIRM** the district court in all respects.